## HARRIS *v.* BOWER

[No. 1, September Term, 1972.]

*Decided October 31, 1972.*

*Motion for rehearing filed November 29, 1972; denied December 6, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Irving H. Fisher,* with whom were *Stanley J. Walcek, Robert E. Ammons, Irving Yochelson* and *Fisher, Walcek & Ammons* on the brief, for appellant.

*John Lewis Kelly,* with whom were *Kelly & Racoosin* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The appellant's late husband (Harris) seems to have become enthralled by the notion that "[t]here is nothing —absolutely nothing—half so much worth doing as simply messing about in boats . . . ." [1] That this delightful and absorbing pursuit was beyond his means has required us to consider whether Code (1964 Repl. Vol.), Art. 95B, the Uniform Commercial Code (UCC), should control our resolution of a situation both antic and novel. We think it should control.

Early in 1964 the appellee (Bower), an Oxon Hill plumbing contractor, bought a new twin-screw Chris-Craft "Roamer" cruiser from the Kentmorr Marina in Stevensville. Its steel hull was 36 feet long; it was powered by gasoline engines. He could not remember the purchase price but he thought it was "less than $20,000." In April 1966 Bower sold the boat to Harris for $17,000. He said its condition was "like new"; that he had used it for only "26 hours for the time [he] had it." The appellant said "he (Harris) had the bottom painted and he had an awning made to enclose the back of the boat (the Barbara K), and he had a new electric toilet put in the head. . . . He kept it up to date." Asked how much time he spent on the Barbara K, she said "[h]e would be gone during Friday evening and [he] would come back Monday and . . . [she thought] most of his time was spent polishing it, looking after it." Although she was "not too crazy about boats" she did go with him "on several occasions." She described its 1969 condition as being

---

1. Kenneth Grahame, *The Wind in the Willows,* ch. 1 (1908).

"perfect. . . . In fact [she said] it could have been better than when Jack [Harris] got it because of the repairs he put on it." John S. Harris testified that in May 1969, just before his father's death, the "boat was in perfect shape. It was like new. . . . He [Harris] took exceptional care of the boat, spent a lot of money putting things on it and taking care of it. . . . He spent a lot of time cleaning it, maintaining it." He thought his father got more enjoyment out of taking care of the boat "than actually using it."

The appellant testified that after her husband's death in June 1969 a neighbor named Carter, who "was just as crazy about the boat as Jack [Harris] was . . . [worked] on it every weekend, or every other weekend, just to make sure the boat was all right."

Irving Yochelson, Esq., appellant's counsel both here and below, testified that after Harris died he had a "number of conversations" with Wilfred M. Dyer, Jr., who said he was Bower's attorney. In his letter of 16 September 1969 to Dyer he told him "[t]here is just no way in which the note can be paid at this time." He quoted John, Jr., as having said "the boat is in excellent condition, . . . [a substantial sum having] recently been spent on it." He asked if Bower "would be willing to accept the return of the boat in exchange for the cancellation of the note" and the payment of the interest. Dyer "phoned [him] and said he no longer represented Bower." Bower denied that Dyer had been his attorney but he said he had been shown the letter from Yochelson.

In February 1970 Charles Sollers went to Solomon's Island to inspect the Barbara K. He owns and operates a marina at Edgewater. He buys, sells and repairs boats and engines. He testified that in his opinion the boat, when he examined it, "would bring about $13,900 in the open market." His qualifications were not controverted, nor was his appraisal challenged.

The entire purchase price ($17,000) was evidenced by the promissory note of Harris and the appellant dated

22 April 1966 and payable two years thereafter. The note was secured by a chattel mortgage on the boat signed by both Harris and the appellant. It is conceded to be a UCC Security Agreement. While Harris never reduced the principal of the note, he did pay interest in July 1967 and August 1968.

In mid-October 1969 Bower sued to reduce the note to judgment. Two months later a summary judgment in the amount of $19,762.50, $1,976.25 attorneys' fees and costs was entered against the appellant and her husband's estate. That the estate is insolvent is undisputed.

Bower recounted his efforts to find a buyer for the boat. He said he "talked to every physical person . . . [he] could think of who would be interested . . ., all boat dealers . . . [he] knew of" and he *thought* he put *one* advertisement in the Washington Star. He said his efforts in this regard brought forth but three offers. Since later we shall have more to say about them, they appear below verbatim.

"JANUARY 4th 1970

MR. DONALD W BOWER
11200 RIVERVIEW ROAD S E
WASH D C 20022

DEAR MR. BOWER,

I AM INTERESTED IN PURCHASING YOUR 36 FT ROMA YACHT AND AM PREPARED TO OFFER THIRTY FIVE HUNDRED CASH ($3500.00).

HOPING THAT YOU WILL REPLY AT YOUR EARLIEST CONVENIENCE, I REMAIN,

JOSEPH C. BAUMANN<br>/s/ Joseph C. Baumann<br>5416 WHITFIELD CHAPEL RD<br>LANHAM MD 20801"

"Charles E. Callow
Certified Public Accountant
3902-04 Rhode Island Avenue
Brentwood, Maryland
20722

January 5, 1970

Mr. Donald W. Bower
5306 Indian Head Highway
Oxon Hill
Washington, D.C. 20021

Dear Donald:

I would like to submit an offer of $4,200.00 for your thirty six (36) foot Roma Steel Hull boat. I will pay the cost of transportation.

/s/ Charles E. Callow
Charles E. Callow"

"John Sharper, Inc. Florist
2101 Brinkley Road—Oxon Hill, Md. 20022
Store and Greenhouses
January 11, 1970

Mr. Donald W. Bower
5306 Indianhead Hwy.
Oxon Hill, Maryland 20021

Dear Mr. Bower:

I have had two (2) Cris Craft boat dealers examine the inside of your steel Cris Craft Cruiser, Maryland #3758-H and they tell me that none of the yearly maintenance inside of the hull have been kept up in accordance with the manual and now I find it quite expensive to have it done at this time, however the outside of the hull looks quite good.

I am willing to make an offer of $4,500.00

where is and as is. Enclosed is my check in the amount of $4,500.00.

Hoping to hear from you at your earliest convenience.

Very truly,
JOHN SHARPER, INC. FLORIST
/s/ Helen L. Sharper
Secretary"

Bower could not recall but we think it likely he sent the three letters (or copies thereof) to the appellant and her attorney during the last week in February. Yochelson said that is when he received them and on 11 March he wrote to Bower as follows:

"I attempted without success to reach you by phone in connection with the copies of the offers you have received for the sale of the boat owned by Jack Harris. Certainly, we cannot consent to the acceptance of any such offer. According to the best information I can obtain, the boat should be worth in the range of $12,000.00 to $15,000.00."

Despite the unconditional tenor of the Sharper letter Bower testified he held the $4,500 check "until after they [Sharper] had a chance to look at . . . [the boat]." He did not know how long he kept the check—three or four weeks was his guess—but when "they said there was too much work to be done on it . . . [and that they] didn't want it" he returned the check. It seems reasonable to suppose that Bower's guess in respect of the date the check was returned was wide of the mark because on 1 May 1970 his attorney filed a praecipe entering a credit of $4,500 upon the judgment against the appellant. He testified he directed the entry of the credit because he "thought he had it sold at that time."

According to the records of the Boating Division of the Department of Chesapeake Bay Affairs (DCBA),

Bower "repossessed" the boat on 30 March 1970. He recited in the "Report: Repossession of Vessel" that "[b]ecause of non-payment [he] took it back." A Certificate of Title was issued to him on 9 April 1970. It seems that sometime thereafter Bower had the boat moved from Solomon's Island to the Fort Washington Marina; later he had it moved to the Oxon Hill Marina. In January of 1971 he filed with DCBA an application for the renewal of the registration. In the block "Owner write signature below" he signed his name. At trial he admitted he had been the owner since April 1970. Nonetheless, Bower insisted he had the boat titled in his name so he could "sell it and give people a clear title." Oddly enough there is little, if any, credible evidence of any effort on his part to sell the boat after he had obtained title and possession.

Bower testified that he had not yet paid the bill ($1,800) from the Oxon Hill Marina. The bill was not introduced in evidence nor have we found in the record anything to suggest how much of it was for storage ($45 to $60 per month), how much for repairs or how much for maintenance. This aspect of the situation is further obscured by Bower's testimony that he repossessed the boat "so . . . [he] could put it back in condition to sell it and when . . . [he] found out what it cost . . . [he] stopped." At trial he testified he thought he could "sell it for scrap iron, scrap steel."

The appellant filed her bill of complaint for an accounting, damages and other relief in March 1971. The case came on for trial before the chancellor, Bowie, J., on 15 September 1971. On 13 October he filed his opinion and decree, the relevant parts of which follow:

"There is conflicting testimony as to the present value of the boat, but whatever its value, it apparently no longer equals the amount of the judgment (less the credit entered by praecipe May 1, 1970, in Law No. 42,061) which now is in the amount of $17,238.75 plus costs. Thus

it is not reasonable to expect the defendant to retain the boat in complete satisfaction of the obligation. Maryland Annotated Code, Art. 95B, § 9-505(2) (Repl. Vol. 1964). This is one of his options under the Uniform Commercial Code. His other alternative is to dispose of the boat according to § 9-504, in a commercially reasonable manner and to apply the proceeds as provided therein.

"Accordingly, for the reasons stated above, the relief prayed in the plaintiff's Bill of Complaint is denied and the case is determined based on the entire record in these proceedings, and it is this 13th day of October, 1971, by the Circuit Court for Prince George's County, Maryland,

"ADJUDGED, ORDERED and DECREED, that the aforesaid boat (described as a 1964 Chris-Craft Roamer (steel hull) Cruiser, Mfg. Hull No. RXD36032OR, Maryland No. 3758H) be sold at a Judicial Sale, pursuant to Maryland Rules, Subtitle BR, within 30 days from date of this Decree; and it is further

"DECREED, that the proceeds of said Sale be applied according to Maryland Code Annotated, Art. 95B, § 9-504(1) (Repl. Vol. 1964); and it is further,

"DECREED, that if said proceeds are less than the amount of $17,238.75, the provisions of § 9-504(2) as to deficiency will control; and it is further,

"DECREED, that Robert E. Ammons, Esq., and David H. Gwynn, Esq. are hereby appointed Trustees for such Sale."

On 5 January 1972 Judge Bowie filed a supplementary opinion and order finding as a fact that the credit of $4,500 "was filed by counsel prematurely, inasmuch as the sale, upon which the credit was based, never took

place." The judgment against the appellant was thereupon increased to $21,738.75.

## I.

Appellant invokes § 9-505(2) of the UCC in support of her contention that Bower has accepted and retains possession of the boat in satisfaction of the obligation. The pertinent parts of § 9-505(2) are as follows:

> "In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor . . . . If the debtor . . . objects in writing within thirty days from the receipt of the notification . . . the secured party must dispose of the collateral under § 9-504. In the absence of such written notification the secured party may retain the collateral in satisfaction of the debtor's obligation."

Bower did not "propose [either orally or in writing] to retain the collateral in satisfaction of the obligation." Some courts, it is true, seem to have held that a written proposal may not be absolutely essential, especially where the secured party conducts himself in a manner so unfair or so unreasonable as to amount to a retention of the collateral in satisfaction of the obligation. *Brownstein v. Fiberonics Industries, Inc.*, 110 N. J. Super. 43, 264 A. 2d 262 (1970); *Bradford v. Lindsey Chevrolet Co., Inc.*, 117 Ga. App. 781, 161 S.E.2d 904 (1968); *Northern Financial Corp. v. Chatwood Coffee Shop, Inc.*, 4 UCCRS 674 (N. Y. Sup. 1967); *Gathright v. Russell*, 383 S.W.2d 441 (Civ. App. Tex. 1964). Bower could hardly have considered it to be in his interest to do so. It must be assumed that he rejected Yochelson's proposal and it seems clear to us that he anticipated the recovery from the appellant of the full amount of the judgment. The estate of Harris is insolvent but it is fair to

assume that appellant is not judgment-proof. While we think Bower has come perilously close to painting himself into a corner in this regard we are unwilling, in these circumstances, to hold that what he has done extinguishes the entire debt.

## II.

Appellant is on much firmer ground in contending that, in respect of his possession of the boat, Bower has not acted in a commercially reasonable manner. Sec. 1-102(1) of the UCC requires it to be "liberally construed and applied to promote its underlying purposes and policies." Sec. 1-203 imposes an obligation of good faith in the performance and enforcement of every contract or duty within the UCC. Sec. 9-504(3) requires that "every aspect of the disposition [of collateral] including the method, manner, time, place and terms must be commercially reasonable." Sec. 9-507(2), in pertinent part, is as follows:

> "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. *The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of dispositions."* (Emphasis added.)

What follows is an excerpt from paragraph 6 of the "Official Comment" under § 9-504:

"See Section 9-507(2). Under that provision a secured party who without proceeding under Section 9-505(2) held collateral a long time without disposing of it, thus running up large storage charges against the debtor, where no reason existed for not making a prompt sale, might well be found not to have acted in a 'commercially reasonable' manner. See also Section 1-203 on the general obligation of good faith."

While the text of the UCC does not deal, *in ipsissimis verbis,* with the odd situation here presented we think any reasonable interpretation of the meaning of the italicized sentence in the excerpt from § 9-507(2), *supra,* will point the way to a proper appraisal of Bower's conduct, especially when considered in the light of the Official Comment, *supra.* We find support for our approach to a resolution of the question in the recently decided *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F. Supp. 659 (W. D. Okl. 1972). The chattel there involved was a Super-Constellation aircraft. The Lease Agreement was found to be a Security Agreement as defined by UCC. The principal question was whether the plaintiff, after repossessing the aircraft, proceeded in a commercially reasonable manner in selling it. As pointed out by the district judge:

". . . The Plaintiff did not advertise the aircraft for sale in any of the customary trade journals or publications. Plaintiff did not show the aircraft or do any work on the same to make it attractive for showing and sale. Plaintiff waited only 28 days after repossession and 8 days after termination of the lease to sell the aircraft. Plaintiff sold the aircraft to Defendant's sub-lessee and the entity from which Plaintiff secured possession of the aircraft. Plaintiff contacted only one of five or six operators who were in operations in which this

type of aircraft was being utilized. Plaintiff contacted only one aircraft broker and did not place the aircraft with him for sale. All other contacts by Plaintiff were within its own organization. Plaintiff's agent in charge of the sale testified that he did not advertise the plane because he did not want to get involved with a broker's commission; that Plaintiff's Finance Committee reviewed the matter and instructed him to get rid of the aircraft. . . . Defendants offered testimony that . . . the aircraft involved herein was not grounded when repossessed and sold but had a Certificate of Airworthiness and was capable of being flown. Defendants also produced evidence that it would cost only approximately $300 per month to maintain the aircraft pending timely efforts to properly sell the same which amount would have covered the cost of ground insurance, airport parking fees and engine run-up expense." *Id.* at 662.

In the case at bar the boat was not sold but it is clear that Bower did not advertise it for sale in any of the customary yachting publications such as "Yachting" or "Motor Boating." He did not place it with a yacht broker. Anyone knowledgeable in this field would surely have predicted that a single advertisement in the Washington Star would be unproductive, as indeed it turned out to be. The "offers" of Baumann, Callow and Sharper have a curiously improbable air. The appellant caused a subpoena to be issued for Baumann's attendance at the trial but the deputy's return was "Non est—moved out of the area" and his letter does not strike us as the approach a yachtsman or a would-be yachtsman would make. Callow was at least an acquaintance of "Dear Donald" and what he meant by offering to "pay the cost of transportation" is something of an enigma. Callow was returned "Summoned" but he did not appear. Bower does not appear to have made any effort to procure the testimony of either of the "two (2) Cris Craft boat

dealers" mentioned in Sharper's letter. Although the letter suggests Bower could have accepted the offer merely by cashing the check one might well doubt he ever intended to sell at that price.

In *Dynalectron, supra,* the court said:

> "In the circumstances of this case, the Court finds and concludes the Plaintiff did not sell the aircraft in a commercially reasonable manner. Plaintiff did not advertise or otherwise make normal and reasonable contacts within the industry to dispose of the aircraft. Rather, the Court believes that Plaintiff merely took the quick and easy way out by selling the aircraft to the same people who had been using it.
>
> "As the Court finds that the sale of the aircraft by the Plaintiff was not accomplished in a commercially reasonable manner, the Plaintiff is not entitled to a deficiency judgment against either Defendant. 4 Anderson Uniform Commercial Code § 9-504:28 states, 'The creditor is not entitled to a deficiency judgment unless the sale of the collateral was conducted in a manner which was commercially reasonable.' " *Id.* at 663.

We have been unable to hazard a guess as to what Bower may have had in mind during the period April 1970 to September 1971, a period embracing two full boating seasons. Most chattels depreciate at a fairly constant rate but it is well known that yachts like the Barbara K, if not carefully and constantly maintained, depreciate at a ruinously progressive rate. Bower permitted this to happen and this seems to us to be not only not commercially reasonable but to be also utterly lacking in common sense.

The uncontroverted evidence seems to support the notion that the boat had a fair market value of $13,900 when he took title and possession. What it was worth at the time of trial we can only guess, since the chan-

cellor made no finding, but it seems safe to assume it was worth a great deal less. The shrinkage in value must be attributed to Bower's conduct which we are persuaded to categorize as not commercially reasonable.

We think the chancellor could very well find that the appellant is entitled to a credit of $13,900. We shall remand the case for his further consideration in this regard. A claim is made that the chancellor neglected to allow a credit for the $1,042.12 interest payment made by Harris in August 1968. It seems to us that in this regard the record is not at all clear. Upon remand the precise figure can be calculated by the chancellor. It is hardly necessary to observe that after a proper credit is accomplished Bower, having become the record owner of the Barbara K, may make whatever disposition of it suits his fancy.

> *Decree of 13 October 1971 and 5 January 1972 reversed.*
>
> *Case remanded for further consideration and for the passage of a decree conformable with the views expressed in this opinion.*
>
> *Costs above and below to be paid by the appellee.*