**NATIONAL BANK OF WASHINGTON,**
**Plaintiff–Appellee,**

v.

**John B. PEARSON,**
**Defendant–Appellant,**

**and**

**Danielle R. Pearson; Does I–X,**
**Defendants. (Two Cases)**

**NATIONAL BANK OF WASHINGTON,**
**Plaintiff–Appellant,**

v.

**John B. PEARSON,**
**Defendant–Appellee,**

**and**

**Danielle R. Pearson; Does**
**I–X, Defendants.**

**Nos. 87–3570, 87–3558L and 87–3567.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1988.
Decided Dec. 14, 1988.

Ferdinand J. Mack, Frederick, Md., for defendant-appellant.

Henry Robbins Lord (C. Lamar Garren, Stephen H. Kaufman, Piper & Marbury, Baltimore, Md., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, and SPROUSE and WILKINS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

In this consolidated diversity action, defendant John B. Pearson appeals the district court's grant of summary judgment against him on the issue of his liability under a loan guaranty agreement he had entered into with plaintiff National Bank of Washington ("NBW"). In a cross-appeal, NBW contends that the district court erred in refusing to allow it to amend its answer to a counterclaim for slander brought by Pearson and in denying its motion for judg-

ment n.o.v. on the issue of the jury's award of punitive damages against it. We affirm the grant of summary judgment against Pearson and the denial of NBW's motion for leave to amend its answer, but reverse the denial of NBW's motion for judgment n.o.v.

## I.

The history of this case is rather serpentine, but it is necessary to set it forth in some detail in order properly to address the parties' contentions.

In 1975, John B. Pearson was president of Keys Corporation ("Keys"). In order to obtain a loan for Keys, Pearson and his then wife Danielle entered into a guaranty agreement with NBW in which the Pearsons expressly agreed

> that the taking or possession of any security or form of security shall in no way affect our liability hereunder, and that in case of default in payment legal proceedings to enforce such payment may be instituted and prosecuted against any one or more of us without first having recourse to any other available security or other available remedy.

Thereafter, NBW made a loan of $2,000,000 to Keys, taking a security interest in, among other things, Keys' accounts receivable.

Keys' financial position began to deteriorate in 1975. In spite of Keys' declining fortunes, however, Pearson engaged in a pattern of highly questionable self-dealing. He caused the transfer with inadequate consideration of two valuable pieces of real estate owned by Keys to a trust established for the benefit of his children, paid himself a large bonus, and even had Keys prepay the rent on his leased Mercedes automobile for six months in 1978.[1] By December, 1978, Keys' financial situation had declined to such a point that NBW declared a default on its loan. Keys consented to the entry of judgment against it for $2,051,896.50 in principal and interest, and NBW took possession of its accounts and began to collect them.

Pearson had moved to Nevada in November, 1978, about one month before Keys' default, and his address was unknown. In December, 1978 or January, 1979, NBW's Arthur Spielman contacted the Valley National Bank in Nevada and spoke with bank officer William Waldren. The two men disputed the content of their conversation at trial. Waldren testified that Spielman had indicated that the call was a "skip trace," that is, an inquiry from one bank to another concerning the whereabouts and finances of a debtor trying to avoid his obligations. Waldren testified that Spielman told him that Pearson had "[taken] inventory, [sold] inventory and [taken] the money, or [taken] ... inventory that was pledged against the loan." Spielman denied telling Waldren that Pearson had stolen inventory or proceeds.

In December, 1978, NBW brought an action against Pearson in a Maryland state court to recover under the guaranty agreement. NBW moved for summary judgment on the issue of Pearson's liability. Pearson resisted, arguing that NBW had failed to collect Keys' accounts receivable that it held as collateral. Pearson contended that this behavior was commercially unreasonable and that NBW was therefore precluded from seeking payment from Pearson by Maryland's enactment of the Uniform Commercial Code, Md.Com.Law Code Ann. § 9–504(3) (1975) ("UCC"). The

---

1. The lawyer who ultimately became Keys' trustee in bankruptcy testified that the expenditures that Pearson had caused Keys to make were "shocking" and that Pearson had "looted" Keys. His testimony warrants quotation:

> Q. Now, when your investigation and examination turned up the Pearson trust, the bonus payments and, for example, payments of this sort [the prepaid rent on the automobile], what did this lead you to conclude as the court appointed trustee?

> A. Well, it led me to conclude that this corporation had been looted. Looted at the time when it was clearly insolvent by its own records ... at a time when creditors weren't being paid, that apparently all the money that was available was used to feather the nests of the principals.

> Q. And who looted the corporation, if you know?

> A. Well, primarily, John Pearson, but his hand picked people were permitted to loot also, as is shown by the checks.

state court granted NBW's motion, ruling that in the guaranty agreement Pearson had expressly waived any entitlement he may have had to a commercially reasonable disposition of the collateral, and the case proceeded to trial on the issue of the amount of Pearson's liability. Just before trial was to begin, however, Pearson removed the action to federal district court in Maryland and moved for reconsideration of the order granting summary judgment. Judge Murray denied Pearson's motion, reasoning that considerations of federalism and the law of the case doctrine required him to let the state court's order stand.

While NBW's action against Pearson was proceeding in the Maryland court, Keys' creditors commenced an involuntary bankruptcy proceeding against it in March, 1979. NBW ceased its efforts to collect Keys' accounts receivable at that time and cooperated with the bankruptcy trustee in collecting the remaining accounts and in achieving an orderly liquidation and distribution of the rest of Keys' collateral. Meanwhile, NBW brought another lawsuit against Pearson in federal district court in Nevada in April, 1980. Pearson, having been apprised of Spielman's conversation with Waldren, brought a counterclaim against NBW for slander.[2] NBW moved for summary judgment on the issue of Pearson's liability under the guaranty. The Nevada district court denied NBW's motion. It was of the view that Pearson might "be correct in his assertion that a guarantor may rely on commercial reasonableness, even where the guarantee is phrased in absolute terms, if the creditor chooses first to act against the collateral."

In March, 1982, the Nevada action was transferred to the Maryland district court and consolidated with the action pending there. NBW moved for summary judgment in the transferred Nevada action on the issue of Pearson's liability, and Judge Black granted its motion, noting that "the

peculiar circumstances" of the case made reconsideration of the Nevada court's order "particularly appropriate." Judge Black stated that the earlier order of the Maryland state court granting NBW's motion, which Judge Murray had approved, was "a thorough and reasoned interpretation of the law." He explained further that "fundamental notions of federalism" and judicial efficiency required that the state court opinion—the "law of the case"—apply in the consolidated action.

The case proceeded on the remaining issues. In February, 1984, almost four years after the action was commenced, NBW moved to amend its answer to Pearson's slander counterclaim to assert a defense of privilege. Judge Black denied NBW's motion on the ground that it had "waived its right to assert [the defense] by not so pleading in accordance with the Federal Rules of Civil Procedure." Trial began before then Magistrate Smalkin[3] in April, 1986, but had to be suspended when NBW's counsel withdrew after it became apparent that he would be called as a witness. In October, 1986, after its present counsel had entered the case, NBW again moved to amend its answer to include a defense of privilege. Magistrate Smalkin denied this motion, reasoning that although the policy of the Federal Rules is to allow liberal amendment of pleadings, Judge Black's order had become the law of the case.

The jury trial of the consolidated action took place in November, 1986. The jury found that Pearson owed NBW $1,584,-225.00 under the guaranty; Magistrate Smalkin revised this amount upward to $2,326,884.85, the full uncontested amount of NBW's claim. The jury found in favor of Pearson on his slander counterclaim, however, and awarded him $5,500 in compensatory damages and $300,000 in punitive damages. NBW moved for judgment n.o.v. on the question of punitive damages

---

2. Pearson also filed counterclaims against NBW for abuse of process and malicious prosecution. Pearson subsequently dismissed the malicious prosecution claim and lost at trial on the abuse of process claim. Neither of these issues is before us in this appeal.

3. Magistrate Smalkin became a United States District Judge for the District of Maryland during the course of this litigation.

or in the alternative for a remittitur of the punitive damage award. The district court denied NBW's motion, and this appeal and cross-appeal followed.

## II.

We address first Pearson's contention that the district court erred in granting summary judgment for NBW on the issue of Pearson's liability under the guaranty agreement.

Section 9–504(3) of the UCC expressly provides that "every aspect of the disposition" of a debtor's collateral by a secured creditor must be "commercially reasonable." While the UCC is silent as to the consequences of a secured party's failure to dispose of a debtor's collateral in a commercially reasonable fashion, the Maryland Court of Appeals has suggested strongly that such a failure bars a deficiency action against the debtor. In *Harris v. Bower*, 266 Md. 579, 295 A.2d 870 (1972), that court quoted approvingly a federal district court's declaration that a " 'creditor is not entitled to a deficiency judgment unless the sale of the collateral was conducted in a manner which was commercially reasonable.' " 266 Md. at 591, 295 A.2d at 876, *quoting Dynalectron Corp. v. Jack Richards Aircraft Co.*, 337 F.Supp. 659, 663 (W.D.Okla.1972). *See* Sachs and Belgrad, *Liability of the Guarantor of Secured Indebtedness After Default and Repossession Under the Uniform Commercial Code: A Walk on the Wild Side by the Secured Party*, 5 U.Balt.L.Rev. 153, 186–87 (discussing *Harris*). Moreover, in *Maryland Bank v. Wathen*, 288 Md. 119, 414 A.2d 1261 (1980), the court expressly held that a secured creditor's compliance with another provision of § 9–504(3), the requirement that the creditor notify the debtor of the time and place of a public sale of his collateral, is a condition precedent to recovery from the debtor.

■ Pearson argues that § 9–504(3) applies to guarantors as well as debtors and therefore precludes NBW, which he asserts did not dispose of Keys' collateral in a commercially reasonable fashion, from attempting to collect from Pearson under the guaranty. While the UCC is again silent and the Maryland Court of Appeals has not addressed the issue, Pearson's argument is persuasive. A guarantor is liable to the creditor in the event the debtor cannot pay. Thus a guarantor seems to fit well within the UCC's definition of a debtor as the person "who owes payment or other performance of the obligation secured." UCC § 9–105(1)(d). Indeed, the "majority of jurisdictions construing this language have found that guarantors ... and other obligors who owe a collateral duty to pay deficiencies are debtors within the meaning of Article 9" of the UCC. *Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 1002–03 (E.D.Pa.1982) (listing cases). *See also* 8 Hawkland, Lord, and Lewis, UCC Series § 9–105:05 n. 9 (1986) (majority of courts consider guarantors to be debtors for the purposes of § 9–504).

We do not need to decide the issue in this case, however. Even if we assume that Pearson as a guarantor was entitled to a commercially reasonable disposition of Keys' collateral, a further question remains: whether Pearson effectively waived this entitlement in the guaranty. The Maryland trial court held that in signing the guaranty Pearson gave up any right he might have had in this regard, citing Pearson's express agreement that NBW could institute legal proceedings against him to enforce payment "without first having recourse to any other available security or pursuing any other available remedy." In the district court, Judge Black concurred, stating that the state court's determination was a "thorough and reasoned interpretation of the law."

■ Under UCC § 9–501(3), a debtor may not waive his entitlement to a commercially reasonable disposition of his collateral by a secured creditor. The UCC is silent, however, as to a guarantor's capacity to do so, and the Maryland Court of Appeals has not announced its view on the matter. Were the question before us in a different procedural posture, we might well certify it to the Maryland Court of Appeals pursuant to Maryland's certification statute, Md.Cts. & Jud.Proc.Code Ann.

§ 12–601 *et seq.* *See Welsh v. Gerber Products, Inc.* 839 F.2d 1035 (4 Cir.1988). Certification would be inappropriate here, however, because Pearson himself removed this case from Maryland state court after the Maryland judge decided the question against him. If Pearson had wanted the Maryland Court of Appeals to rule on the matter, he should not have removed the action to federal court.

■ As we have noted in the past, "in determining state law in diversity cases where there is no clear precedent," we accord "substantial deference to the opinion of a federal district judge because of his familiarity with the state law which must be applied." *Caspary v. Louisiana Land and Exploration Co.,* 707 F.2d 785, 788 n. 5 (4 Cir.1983). *See also Jaffe–Spindler Co. v. Genesco, Inc.* 747 F.2d 253, 257 n. 5 (4 Cir.1984); *accord Perkins v. Clark Equip. Co.,* 823 F.2d 207, 208 (8 Cir.1987); *Taylor v. Sentry Life Ins. Co.,* 729 F.2d 652, 654 (9 Cir.1984). In this case, Judge Black, who as an attorney and district court judge has had considerable experience in dealing with questions of Maryland law, reviewed the state court's opinion and concluded that its interpretation of Maryland law was correct. His view finds support in the rulings of a number of courts in other jurisdictions that a guarantor may waive his entitlement to a commercially reasonable disposition of the debtor's collateral under UCC § 9–504. *See e.g., United States v. H & S Realty Co.,* 837 F.2d 1 (1 Cir.1987); *United States v. New Mexico Landscaping, Inc.,* 785 F.2d 843 (10 Cir.1986); *United States v. Meadors,* 753 F.2d 590 (7 Cir.1985). *But see United States v. Willis,* 593 F.2d 247 (6 Cir.1979). We therefore deem it appropriate in this case to defer to the rulings of the Maryland state court and the district court that Pearson waived whatever entitlement he may have had under Maryland law to a commercially reasonable disposition of Keys' collateral and affirm the district court's grant of summary judgment for NBW on the issue of Pearson's liability under the guaranty. *See Maryland Casu-*

*alty Co. v. Burley,* 345 F.2d 138, 139–40 (4 Cir.1965) (joining district court in deferring to state trial court's interpretation of state law in absence of ruling by state's highest court).

## III.

In its cross-appeal, NBW contends that the district court erred in denying it leave to amend its answer to Pearson's counterclaim for slander in order to assert a defense of privilege. Fed.R.Civ.Pro. 15(a) provides that a party may amend its pleading at any time by leave of the district court, which "shall be freely given when justice so requires."[4] Although the decision whether to grant a party leave to amend its pleading rests within the sound discretion of the district court, *see Sandcrest Outpatient Services v. Cumberland County Hospital System,* 853 F.2d 1139, 1148 (4 Cir.1988), it is well-settled that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ We do not think that the district court abused its discretion in this case. NBW argues that the only reason the district court could have had for denying its motion was NBW's delay in requesting leave to amend in the consolidated action. NBW points out, quite correctly, that delay alone is not a sufficient reason to deny a party leave to amend its pleading. *See Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4 Cir.), *cert. dismissed,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); *Ward Electronics Service, Inc. v. First Commercial Bank,* 819 F.2d 496, 497 (4 Cir.1987); *Johnson v. Oroweat Foods Co.,*

---

**4.** Rule 15(a) also provides that a party may amend its pleading once as a matter of course at any time before a responsive pleading is served, or, in certain circumstances, within twenty days after the party's pleading is served. These provisions are not at issue in this case.

785 F.2d 503, 509–10 (4 Cir.1986). When accompanied by bad faith on the part of the movant, futility of the proposed amendment, or prejudice to the non-movant, however, undue delay is an appropriate ground for a district court's denial of leave to amend. *See Deasy v. Hill*, 833 F.2d 38, 40 (4 Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988); *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4 Cir.1987); *Johnson*, 785 F.2d at 509–10.

In this case, there is ample evidence of undue delay, bad faith, and prejudice. NBW moved for leave to amend almost four years after Pearson brought his counterclaim in the Nevada action and almost two years after the Nevada and Maryland actions were consolidated in Maryland federal court. NBW has failed to offer any reason for this delay, and, absent explanation, it may be inferred from a review of the record that NBW's motion for leave to amend was a "design by dilatoriness to harass the opponent." *Davis*, 615 F.2d at 613; *cf. Deasy*, 833 F.2d at 41 (delay undue where plaintiff failed to offer any reason for his delay and made motion to amend right before trial after discovery was complete). Moreover, we do not agree with NBW that its proposed amendment would not have prejudiced Pearson. True, Pearson already had conducted discovery on the circumstances and substance of the Spielman–Waldren conversation, but, because NBW had not asserted the defense in its answer, he did not do so with the aim of negating a possible claim of privilege. As we explained in *Deasy*, pleadings are meant to state the issues in a case "so that the parties can conduct discovery and present their claims intelligently." *Deasy*, 833 F.2d at 41. Here, NBW's answer did not alert Pearson that NBW would assert a defense of privilege, and Pearson "could quite sensibly have decided not to commit [his] resources to a shadowy claim that

[NBW] may or may not have been serious about raising." *Id.* To paraphrase *Deasy*, it would have been manifestly unfair to make Pearson go to trial without having had a fair opportunity to prepare his case or to make him conduct discovery a second time in order to meet NBW's newly asserted defense.

■ We reject as well NBW's contention that the district court abused its discretion by failing to state its reasons for denying NBW leave to amend. As long as its reasons are apparent in the record, a district court's failure to articulate grounds for its denial of leave to amend does not amount to an abuse of discretion. *See Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4 Cir.1987); *Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1153–54 (5 Cir.1981). As we already have indicated, we think that the reasons for the district court's decision in this case are quite obvious.

### IV.

■ We agree with NBW that the district court erred in denying its motion for judgment n.o.v. on the issue of punitive damages. Nevada law [5] allows punitive damages, in an action not arising from contract, where a defendant " 'has been guilty of oppression, fraud, or malice.' " *Warmbrodt v. Blanchard*, 100 Nev. 703, 709, 692 P.2d 1282, 1286 (1984), *quoting* Nev.Rev.Stat. § 42.010. Pearson does not assert that there was evidence of oppression or fraud, so the sole issue before us is whether there was evidence of malice legally sufficient to support an award of punitive damages. The Supreme Court of Nevada has explained that "malice," as used in the Nevada statute, "means malice in fact and denotes ill will, or a desire to do harm for the mere satisfaction of doing it. It contemplates willful and intentional conduct done in reckless disregard of possible results." *Bader v. Cerri*, 96 Nev. 352, 359,

---

**5.** NBW asserts that under Maryland conflict of laws rules, which apply in this diversity action brought in federal district court in Maryland, *Klaxon Co. v. Stentor Electrical Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Nevada law controls the disposition of this issue. *See Sokolowski v. Flanzer*, 769 F.2d 975, 977–78 (4 Cir.1985). Pearson has not contested this assertion. Accordingly, we decide this case under Nevada law on the *sub silentio* agreement that it controls.

609 P.2d 314, 318–19 (1980) (citations omitted).

Judgment n.o.v. may be granted only when, viewing the evidence in the light most favorable to the party who secured the jury verdict, and giving that party the benefit of all reasonable inferences from the evidence, there can be only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. *See Eastern Auto Distributors, Inc. v. Peugeot Motors of America*, 795 F.2d 329, 338 (4 Cir.1986). The district court denied NBW's motion for judgment n.o.v. on the ground that there was sufficient evidence of malice on the part of NBW to justify the jury's award of punitive damages. We disagree. True, there was evidence at trial of some rather inaccurate and intemperate language on the part of Spielman and of NBW's counsel [6] but given Pearson's cavalier treatment of the assets of Keys Corporation, followed by his removal to Nevada, we do not doubt that Spielman and NBW's counsel had good cause to suspect the worst. In any event, with the provocation that they had, we do not think that the language of Spielman and NBW's counsel can support the conclusion that NBW acted with the "desire to do harm for the mere satisfaction of doing it" or "in reckless disregard of possible results." We therefore reverse the district court's denial of NBW's motion for judgment n.o.v.

AFFIRMED IN PART AND REVERSED IN PART.

---

**6.** There was evidence, politely characterized, that NBW's former counsel said that NBW was going to squeeze Pearson to death.