912 A.2d 45

**NILS, LLC, et al.**

v.

**Gladys ANTEZANA, Individually, et al.**

No. 2733, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Dec. 5, 2006.

718

Simon M. Osnos, Falls Church, VA, for appellant.

James W. Salter, III, Rockville, for appellee.

Panel EYLER, DEBORAH S. KRAUSER MOYLAN, CHARLES E., JR. (retired, specially assigned), JJ.

MOYLAN, J.

In early August of 2003, Gladys and Nils Antezana, through the medium of two limited liability companies, were the owners of a partially completed residence at 9212 Harrington Drive in Potomac, Maryland. Abdul Khanu purchased the property for a total purchase price of approximately $5,000,000.00.

Gladys Antezana's interest in the property was through the medium of the Gladimar, LLC, owned by her. Nils Antezana's interest in the property was through the medium of Nils, LLC, owned by him. Each of the LLC's owned an equal share of the property. The mechanism by which Khanu consummated his acquisition of this property on August 7, 2003, was to purchase the two LLC's from Gladys and Nils Antezana.

Khanu initially paid to each of the sellers $1,000,000.00 in cash for their respective LLC's. For the remainder of the purchase price, Khanu executed a promissory note to each of the sellers, each in the original amount of $1,500,000.00. Those promissory notes were secured by twin deed-of-trust notes, one from Gladimar, LLC to Gladys Antezana and the other from Nils, LLC to Nils Antezana, each in the amount of $1,500,000.00.

Nils Antezana died in July of 2004. Gladys Antezana is the personal representative of his estate. She is the appellee in this case in a dual capacity, representing herself individually and as the personal representative of Nils Antezana. For convenience, we will refer to her as the "appellee" in the singular. The appellants are Gladimar, LLC; Nils, LLC; and Abdul Khanu. For convenience, we will sometimes refer to the appellants collectively simply as "Khanu."

### The Provisions for Payment

So much for the cast of characters. We turn to the subject of the arrangement for payment by Khanu to the appellee of the principal and interest owed on the two promissory notes. Each promissory note provided that it was

payable with interest at the rate of 6.5% per annum, payable interest only in equal monthly installments of $8,125.00 payable on the 7[th of] each and every month, the first payment due and payable on September 8, 2003. The entire balance shall be due and payable on or before February 7, 2004, but may not be paid before January 1, 2004.

The notes further provided that if Khanu diligently sought replacement financing in good faith, but had not procured such financing by the original due date of February 7, 2004, "at the written request of Obligor to Holder, the due date for payment of principal shall be extended until July 31, 2004, with the rate of interest from January 1, 2004 through July 31, 2004 being increased to 7.5% and with the amount of each monthly payment of interest being increased accordingly to $9,375." Khanu made no request, written or otherwise, to extend the due date for payment in full.

The notes further provided that Khanu waived demand, presentment for payment, protest, and notice of dishonor. Khanu agreed that the noteholder could, without notice, grant any extension or other postponement of the time of payment without in any manner releasing, lessening or affecting Khanu's obligations under the notes.

The notes define "default" as, *inter alia,* Khanu's failure to pay when due any principal of or interest on the notes.

## Partial Defaults of Payment

During the five months preceding the initial due date for full payment of February 7, 2004, Khanu made timely payments for the months of September and October of 2003 and January of 2004. The payments for November and December of 2003 were late, but Khanu remitted no payment for late charges as required by the notes. The notes provided:

If any payments are not paid within 10 days of the due date, *a late charge of 5% of the then due amount shall be added to the late payment.*

(Emphasis supplied).

Although the promissory notes were due in full on February 7, 2004, Khanu made no tender of payment on that date, nor

did he request that the term of the notes be extended. Notwithstanding that the notes had expressly provided that, if extended beyond February 7, 2004, the 6.5% per annum interest rate would increase to 7.5%, with the monthly installment being accordingly increased from $8,125.00 to $9,375.00, Khanu continued to make monthly payments of only $8,125.00. In a subsequent affidavit, he gave as his excuse for the underpayments the fact that "I did not remember that the payments were supposed to go up."

## The Attorneys' Negotiations

By a letter on August 19, 2004, the appellee's attorney notified Khanu's attorney 1) that the two notes had expired on July 31, 2004 and were still unpaid; 2) that the late charges had not been paid for six months; and 3) that the incremental monthly interest rate through August of 2004 had not been paid. The total due for late charges and unpaid interest came to $26,414.30. The letter offered Khanu the option of extending the payment period until December 31, 2004, but he declined that offer. Although having been placed on written notice of accumulated late charges and unpaid interest, Khanu made no payments on those items. He continued to make monthly interest payments of only $8,125.00.

## The Confessed Judgment Notes

As of November of 2004, Khanu was in the final stages of arranging refinancing of the Harrington Drive property. He intended to pay off all debts to the appellee and to have her, in turn, release the deeds of trust on the property. Settlement was to take on place December 20, 2004.

The major hitch that had to be resolved before settlement was Khanu's 5% late fee for the non-payment of the principal that had become due on July 31, 2004, but had not been paid. It was subsequently agreed that Khanu would execute two promissory notes in the amount of $75,000.00 each in favor of the appellee. The two notes were executed on November 17, 2004. Each note contained a provision providing for confessed judgment in the event of non-payment at the time of maturity.

*After maturity of this Note* (whether by acceleration, declaration, extension, or otherwise), *the Maker hereby authorizes any attorney designated by the Lender* or any clerk of any court of record *to appear for the Maker in any court of record and confess judgment against the Maker without prior hearing* in favor of the Lender *for and in the amount of the unpaid balance* of the Principal Amount then outstanding plus interest accrued and unpaid thereon, together with costs of suit and attorneys' fees of fifteen percent (15%) of the unpaid balance of the Principal Amount then outstanding.

(Emphasis supplied).

In turning over the two promissory notes to counsel for the appellee, Khanu's counsel articulated, in writing, the *quid-pro-quo* of the settlement of all claims between the parties.

As stated in my memo to you dated November 11, 2004, *by their acceptance of these two notes, your clients are acknowledging their release of Mr. Khanu,* Nils, LLC, and Gladimar, LLC *from any claims that they may have had for any defaults arising prior to the date hereof* under (i) the Promissory Note in the principal amount of $1,500,000 dated August 7, 2003, made by Mr. Khanu to Nils Antezana and (ii) the Promissory Note in the principal amount of $1,500.000 dated August 7, 2003, made by Mr. Khanu to Gladys Antezana.

(Emphasis supplied).

As of the maturity date of the notes on May 17, 2005, no payments had been made and Khanu was in clear default on the notes. A judgment by confession in favor of the appellee against Khanu was entered on each note in the Circuit Court for Montgomery County on September 12, 2005. The judgments were entered pursuant to Maryland Rule 2–611(a)

Judgment by confession shall be entered by the clerk upon the filing of a complaint, the original or a photocopy of the written instrument authorizing the confession of judgment for a liquidated amount, and an affidavit specifying the amount due and stating the address of the defendant or that

the whereabouts of the defendant are unknown to the plaintiff.

Pursuant to subsection (b), notice of the entry of the confessed judgments was timely sent to Khanu, who timely filed a motion to vacate pursuant to subsection (c) on October 31, 2005.

*The defendant may move to open, modify, or vacate the judgment* within the time prescribed for answering by sections (a) and (b) of Rule 2–321. *The motion shall state the legal and factual basis for the defense to the claim.*

(Emphasis supplied).

A hearing was conducted on Khanu's motion to vacate the confessed judgments before Judge John Debelius on February 2, 2006. Judge Debelius denied the motion, and Khanu has appealed from that denial.

### Confessed Judgment

In *Schlossberg v. Citizens Bank*, 341 Md. 650, 655, 672 A.2d 625 (1996), Judge Chasanow well stated the function of a judgment by confession.

A confession of judgment clause in a debt instrument is a device designed to facilitate collection of a debt. *It is a provision by which debtors agree to the entry of judgment against them without the benefit of a trial in the event of default on the debt instrument.* PAUL V. NIEMEYER AND LINDA M. SCHUETT, MARYLAND RULES COMMENTARY, at 464 (2d ed.1992). As a general rule, a judgment by confession is "entitled to the same faith and credit, as any other judgment."

(Emphasis supplied).

The courts, however, have been liberal in considering attacks on confessed judgments by aggrieved creditors.

Because the widespread practice of including a provision authorizing a confessed judgment in promissory notes lends itself to fraud and abuse, however, this Court has made

clear that *judgments by confession are to be " 'freely stricken out on motion to let in defenses.' "*

*Id.* (emphasis supplied).

The *Schlossberg* opinion also laid out the procedures to be followed when a motion to vacate a confessed judgment is filed.

Rule 2–611 governs the procedure for confessed judgments in Maryland. *Judgment by confession may be entered by the circuit court clerk upon the filing of a complaint* accompanied by the original or a copy of the instrument authorizing the confessed judgment and an affidavit specifying the amount due and stating the address of the defendant. Md. Rule 2–611(a). Upon entry of a judgment by confession, *the clerk is required to notify the defendant of the entry of judgment and of the deadline for filing a motion to "open, modify or vacate" the judgment.* Md. Rule 2–611(b).

*If the defendant so moves, the circuit court must determine whether there is a "substantial and sufficient basis for an actual controversy as to the merits of the action."* Md. Rule 2–611(d). In other words, *the court must determine whether the defendant has a potentially meritorious defense to the confessed judgment complaint.* The court does not, however, decide the merits of the controversy at this stage. Maryland Rules Commentary, at 466. If the court finds that a basis for a defense exists, the rule requires the court to order that the confessed judgment be opened, modified, or vacated so that the defendant can file a responsive pleading to the plaintiff's complaint and the merits can be determined. Md. Rule 2–611(d).

*Id.* at 655–56, 672 A.2d 625 (emphasis supplied).

### The Allocation of the Burden of Proof

 As the moving party on a motion to open, modify, or vacate a confessed judgment, the defendant/debtor is allocated the burden of proof. What must be proved, of course, are not the ultimate merits of the underlying obligation (the promissory note itself, for example) but only that there is a meritorious

(prima facie) defense to the execution or amount of the confessed judgment itself. In *Remsburg v. Baker*, 212 Md. 465, 469, 129 A.2d 687 (1957), the Court of Appeals spoke of both the allocation of the burden of proof and the nature of the burden of proof.

> Necessarily, *one making the motion assumes the burden of supporting the facts alleged in it*, and as to all matters not going to the merits of the controversy, such as surprise or deceit in the entry of the judgment itself, he must prove such facts by a fair preponderance of the evidence. But *as to defenses going to the merits of the claim upon which the judgment rests*, a different rule prevails. In such cases, *if the evidence adduced in support of the motion is sufficient to persuade the fair and reasoned judgment of an ordinary man that there are* substantial and sufficient *grounds for an actual controversy as to the merits of the case, the defendant should be deemed to have met the burden of showing that he has a meritorious defence.* In other words, if the evidence is such that persons of ordinary judgment and prudence could honestly and fairly draw different inferences from it, one favoring the plaintiff and the other the defendant, the court should not itself decide that conflict, but should submit it to a jury.

(Emphasis supplied). See also *Billingsley v. Lincoln National Bank*, 271 Md. 683, 689, 320 A.2d 34 (1974); *Gambo v. Bank of Maryland*, 102 Md.App. 166, 185, 648 A.2d 1105 (1994) ("In connection with a motion to vacate, the moving party has the burden of presenting evidence sufficient to support the purported defense."); *Garliss v. Key Federal Savings Bank*, 97 Md.App. 96, 104, 627 A.2d 64 (1993) ("One moving to strike a judgment by confession has the burden of presenting evidence satisfactorily supporting its purported defense."); *Shafer Brothers v. Kite*, 43 Md.App. 601, 605, 406 A.2d 673 (1979).

### What Is a Meritorious Defense?

### A Question of Law For the Court

On the issue of whether what is offered by a party seeking to open, modify, or vacate a confessed judgment

qualifies as a meritorious defense, that is a question of law for the judge. *Gambo v. Bank of Maryland,* 102 Md.App. at 185, 648 A.2d 1105 ("What constitutes a meritorious defense is a question of law."); *Garliss v. Key Federal,* 97 Md.App. at 104, 627 A.2d 64 (same); *Shafer Brothers v. Kite,* 43 Md.App. at 606, 406 A.2d 673 ("The issue of what can constitute a meritorious defense, assuming that the supporting facts are believed, is a question of law.").

### A Meritorious Defense to What?

When the caselaw speaks of "a meritorious defense" to a judgment by confession, what precisely is it that such a defense is contemplated as attacking or challenging? It is not intended to be an attack on the antecedent debt or obligation itself, for which, for instance, a promissory note (and its attendant confession of judgment) might have been given in satisfaction. The notion of a "defense to the claim" under Rule 2–611(c) means a defense to the precise thing as to which judgment was allegedly confessed. When the case law speaks of a "meritorious defense," that otherwise open-ended concept is most definitely limited by the prepositional phrase "to the claim."

If, for instance, a promissory note accompanied by a confession of judgment is given, the resulting judgment by confession is not a confessed acknowledgment of any debt or obligation which may have led to the making of the promissory note. What is allegedly confessed is simply the validity of the promissory note itself or the amount due on the note. By the same token, a "meritorious defense to the claim" is not a defense to everything that may have gone before in the long and possibly tortuous financial history between the parties. A "defense to the claim" is a defense challenging 1) the execution of the promissory note itself or 2) the amount of debt due on the note.

If it is alleged, for instance, that the signature on the promissory note was a forgery, that is self-evidently "a defense to the claim." If it is alleged that the note was not voluntarily made but was the product of legally cognizable

duress, that is "a defense to the claim." If it is alleged that the promissory note was signed by one not authorized to bind the obligor, that is "a defense to the claim." If it is alleged that the amount due on the promissory note should be reduced by a partial payment that has already been made, that is "a defense to the claim." If it is alleged that the amount due on the note should be reduced by a set-off, that is "a defense to the claim."

If, by contrast, it is alleged that the manifold misdeeds of the holder created financial pressure on the obligor to make what would otherwise qualify as a voluntary promissory note, that is not what Rule 2–611(c) contemplates as a "defense to the claim." Few persons ever gratuitously execute promissory notes as mere exercises in generosity. They generally do so out of financial exigency, but if the act of executing the promissory note is a voluntary one, Rule 2–611(c) does not require us to look behind it.

Both the creating of the obligation as to which judgment is confessed, on the one hand, and the claim as to which there is an allegedly meritorious defense, on the other hand, refer to a relatively recent event or later stage in a possibly much longer history. Neither 1) the thing confessed nor 2) the claim defended against necessarily embraces the entire history of a dispute. With respect to what may be raised in a Rule 2–611(c) motion, and possibly litigated in a resultant hearing, there is a temporal cut-off point. We may reexamine recent history, the note as to which the judgment was confessed, but not ancient history.

When unchallenged or not successfully challenged, a confessed judgment note serves a salutary purpose. But for the phenomenon of confessed judgment, the holder of a promissory note, for example, would have to go to court and, in a formal trial, seek a verdict producing a judgment based on the note. The salutary effect of a valid confessed judgment, to wit, one that is unchallenged or one that has survived a Rule 2–611(c) challenge, is that it permits the holder to by-pass the trouble, the time, the expense, and the uncertainty of a trial. "Confession of judgment is not a judicial act, but rather the

*pro forma* entry of judgment by the clerk of the circuit court."
*Garliss v. Key Federal Savings Bank,* 97 Md.App. at 103, 627
A.2d 64. See also *Gambo v. Bank of Maryland,* 102 Md.App.
at 185, 648 A.2d 1105.

The "meritorious defenses" of which the caselaw speaks go
either to the amount due on the note or to the execution of the
promissory note itself, including the confessed judgment pro-
visions. They do not go to all of the antecedent transactions
and proceedings that may have eventuated in the execution of
the promissory note. In *Remsburg v. Baker,* for example, the
meritorious defense to a judgment by confession on a promis-
sory note was the claim by the ostensible maker of the note
that he never signed the note as a maker, but only as a
witness to the signature of the corporation president. In
*Williams v. Johnson,* 261 Md. 463, 276 A.2d 95 (1971), for
example, a meritorious defense was the allegation by the
ostensible maker of the promissory note on which a judgment
by confession was entered that she had never signed the
promissory note in question and that what was purported to
be her signature was a forgery.

A meritorious defense may go not only to the execution of
the underlying promissory note, in which case the motion
would go to the total vacating of the note, but also to the
amount due on the note, in which case the motion might be
aimed only at the opening and modifying of the confessed
judgment. *Garliss v. Key Federal,* 97 Md.App. at 104, 627
A.2d 64, spoke to such meritorious defense.

> What constitutes a meritorious defense is a question of law.
> Consequently, presenting *evidence of a valid set-off consti-*
> *tutes a meritorious defense, requiring the judgment to be*
> *opened.* Gelzer v. Scamoni, 238 Md. 73, 207 A.2d 655
> (1965). Moreover, *an assertion that the movant is entitled*
> *to a credit may well entitle the moving party to have the*
> *matter submitted to a trier of fact. Cropper v. Graves,* 216
> Md. 229, 139 A.2d 721 (1958).

(Emphasis supplied).

In *Gambo v. Bank of Maryland,* the meritorious defense,
not to the confessed judgment *in toto* but to the amount due

on the confessed judgment, was asserted by a guarantor rather than by the initial obligor on a loan. The meritorious defense, by which the guarantor sought to open and to modify downward the amount due on a confessed judgment, was that the holder, before turning to the obligor for the remaining amount due, had sold seized collateral recklessly for an unreasonably low price. Judge Hollander stated for this Court, 102 Md.App. at 186–87, 648 A.2d 1105.

Although the UCC expressly authorizes private sales of collateral, such sales must be commercially reasonable. *Disposition of the collateral at firesale prices, when the evidence shows that the creditor made little or no effort to find a buyer, is not commercially reasonable. See, e.g., Harris [v. Bower],* 266 Md. [579,] 590–92, 295 A.2d 870 [ (1972) ] (sale of boat for $4,500 was not commercially reasonable, as appraisers had valued it as high as $17,000, and creditor did little or nothing to find a buyer).

(Emphasis supplied).

 This short list of examples is an illustration of what is meant by a meritorious defense to a confessed judgment. It is not the opening up of the whole can of worms of a long and tangled antecedent history of financial wrangling and controversy between the parties. In determining what is a meritorious defense to a judgment by confession, there is a limit to how far back a court must look. It will look, of course, to the underlying debt represented by the promissory note, with respect to which judgment was confessed. It will look to the execution of a promissory note or to its due date or to the amount due on the note. "Who signed the note?" "Was it signed voluntarily?" "Was it signed by one authorized to sign?" A court will not, however, venture into the preceding financial history that may have caused or persuaded the voluntary execution of a facially valid promissory note. That is not part of the judgment that is confessed. The promissory note speaks for itself and does not include a history of why it was executed. It is a matter of what was done and not of why it was done.

▮▮ The starting point for our analysis is November 17, 2004, when the appellant freely and voluntarily executed two promissory notes of $75,000 each in favor of the appellee. To say that the appellant freely and voluntarily executed the promissory notes does not suggest that there were no straitened financial circumstances to which he was responding. Few businesspeople ever sign over $150,000 to a non-relative or non-charity as a gratuitous gesture. There must almost always be some pressure to do so. We simply mean that the appellant was a competent person in full command of his faculties. In his pleadings, the appellant has acknowledged that he executed the two $75,000 promissory notes with "the advice of counsel" and in the presence of counsel. Whatever may have gone before, the making of the November 17, 2004, promissory notes, for purposes of this case, was a new beginning, behind which we need not look. The notes were *per se* valid.

### The Antecedent Debt

The appellant, however, wants to attack the validity of the antecedent debt of $150,000 for which the two notes were offered as satisfaction. He argues that the $150,000 debt represented the 5% "late fee" for the unpaid, as of the maturity date of July 31, 2004, principal of $3,000,000.00. He further argues that the 5% late fee was an unenforceable penalty and that Maryland Code, Commercial Law Article § 14–1315, on which the appellee relies, is inapplicable to a commercial transaction such as the one between the parties in this case.

### Section 14–1315 Applies

We firmly believe that we need not look back beyond November 17, 2004, to the validity of the antecedent debt. The promissory notes of that date, if freely made by the appellant (as they were), speak for themselves.

Even if, however, we were to assume, purely *arguendo*, that we should look back, the appellant's arguments have no merit. The text of § 14–1315 is instructive. Subsection (a) provides

working definitions. Within the broader category of "contracts" is the subset "consumer contracts," defined by § 14–1315(a)(2) as follows:

> "Consumer contract" means a contract involving the sale, lease, or provision of goods or services which are for personal, family, or household purposes.

The larger, more inclusive category of "contracts" includes "consumer contracts" but also includes other contractual agreements, including "commercial contracts," as well. Subsection (a)(3) provides:

> *"Contract"*, unless specifically provided otherwise, *includes consumer, commercial, and business contracts,* covenants, leases of any kind, and tariffs on file with any regulatory authority.

(Emphasis supplied).

Significantly, whenever § 14–1315 refers to "consumer contracts," it uses that qualified term specifically. Whenever it uses the term "contract," without qualification, it refers to the broader category, including for present purposes "commercial contracts." Section 14–1315 covers contracts generally, as well as consumer contracts specifically. The statutory language speaks unequivocally for itself, and we need not follow the appellant down his labyrinthine interpretive by-ways.

### Late Fees

▮ The antecedent debt of $150,000.00 in this case was a late fee. Section 14–1315 covers the subject of "Late fees." Subsection (a)(4) defines "late fee" in a way that clearly embraces the late fee in this case.

> (4)(i) "Late fee" means any charge or fee imposed because a payment is not made when the payment is due under the terms of a contract.

> (ii) *"Late fee" includes a fee imposed* under subparagraph (i) of this paragraph that is described:

> 1. As a flat rate;

> 2. *As a percentage of the amount due;* or

3. In any other terms.

(Emphasis supplied).

Subsection (b) unquestionably authorizes a contractual agreement that a late fee shall be imposed.

(b) *Agreement by parties.*—The parties to a contract may agree to require the payment of a late fee when a party fails to make a payment when the payment is due.

We find totally inapposite the readily distinguishable case law cited by the appellant dealing with a variety of charges that may not be enforced because they are deemed to be impermissible penalties. None of the cases deal with late fees on a promissory note. Subsection(d) expressly provides that a late fee under § 14–1315 is not a penalty.

(d) *Nature of fee.*—*A late fee* imposed under this section *is not:*

(1) Interest;

(2) A finance charge;

(3) Liquidated damages; or

(4) *A penalty.*

(Emphasis supplied).

## Of Ships and Shoes and Sealing Wax ...

As variations on a common theme, the appellant finally contends 1) that he had not defaulted on his payments, 2) that the appellee is equitably estopped from demanding a late fee, and 3) that the appellee has waived her entitlement to a late fee. All of these intertwined defenses are predicated on such permissive behavior by the appellee as letting non-prompt payments slide and not immediately notifying the appellant that he was in default. All of these complaints ignore a clear provision of the original promissory notes of $1,500,000.00 each. Whenever any default may occur, the notes provided that the holder *may* give notice thereof to Khanu. With regard to the rights and remedies of the appellee, the notes provided:

*No failure or delay by the Holder to insist upon the strict performance of any one or more provisions* of this Note or to exercise any right, power or remedy consequent upon a breach thereof or default hereunder *shall constitute a waiver thereof, or preclude the holder from exercising any such right, power or remedy. By accepting full or partial payment after the due date* of any amount of principal or interest on this Note, *the Holder shall not be deemed to have waived the right* either to require prompt payment when due and payable of all other amounts of principal or interest on this Note or *to exercise any rights or remedies available to it* in order to collect all such other amounts due and payable under this Note. *No modification, change, waiver or amendment of this Note shall be deemed to be made by the Holder unless in writing signed by the Holder,* and each such waiver, if any, shall apply only with respect to the specific instance involved.

(Emphasis supplied).

That clear provision relieved the appellee of the useless rigamarole of notifying the appellant of that which the appellant was obligated to be aware of without such notification. The contention is but a catchall of miscellaneous whimpers.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**