6 A.3d 867

**William PEASE, et al.**

v.

**WACHOVIA SBA LENDING, INC.**

**No. 76, Sept. Term, 2009.**

Court of Appeals of Maryland.

Oct. 21, 2010.

Michael S. Myers (Robert B. Scarlett & Croll, P.A., Baltimore, MD), on brief, for appellants.

Diane Festino Schmitt (Matthew T. Vocci of Ober, Kaler, Grimes & Shriver, Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

HARRELL, J.

In this appeal, the parties ask us to consider and shape the contours of Maryland Code (2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 5–408,[1] which serves as a statute of frauds in the regulatory scheme for credit agreements. William and Michele Pease (Appellants)—husband and wife and guarantors on a Small Business Administration (hereinafter "SBA") commercial loan financing substantially their acquisition of a plumbing business—appeal from the denial by the Circuit Court for Baltimore City of their motion to open, modify, or vacate confessed judgments in favor of Wachovia SBA Lending, Inc. (hereinafter "Wachovia" or Appellee), entered against them upon default under the underlying note. In arguing that the confessed judgments should be opened, modified, or vacated, the Peases claim essentially that: (1) the Circuit Court erred in refusing to consider their allegations and evidentiary proffers that Wachovia and its representatives induced them, fraudulently and negligently, to enter a series of related loans through certain oral representations and omissions; or, (2) that, had certain information been disclosed to them by Wachovia, they would not have consummated the SBA commercial loan and guarantees. In response, Wachovia argues that § 5–408—also coined the "Maryland Credit Agreement Act"—bars the admission of these alleged oral representations, as they were not set forth in writing. We hold, as explained more fully *infra*, that, to the extent the Peases' assertions of negligence, fraud, and breach of fiduciary duty were advanced with an eye towards filing counterclaims against Wachovia in the suit on the commercial loan and

---

1. Unless otherwise provided, all statutory references are to Maryland Code, Courts and Judicial Proceedings Article (2006 Repl.Vol.).

guarantees, such assertions do not seek to enforce or modify a "credit agreement" (or constitute a defense to a "credit agreement") within the reach of § 5–408, and thus the Maryland Credit Agreement Act does not apply to bar the Circuit Court from considering the sufficiency of the allegations under Md. Rule 2–611(d). To the extent the Peases' assertions were advanced, however, with an eye towards seeking a declaration that the credit agreement represented by the SBA commercial loan and guarantees was void *ab initio*, we hold that the Maryland Credit Agreement Act would apply to bar the Circuit Court from considering such allegations in this matter. We vacate the judgment of the Circuit Court and, as explained *infra*, remand to that court for consideration of whether the Peases alleged sufficiently one or more tortious acts, that may be plead as counterclaims, so as to justify opening, modifying, or vacating the confessed judgments.

## FACTS AND LEGAL PROCEEDINGS

William Pease (hereinafter "William") and Michele Pease (hereinafter "Michele") were the former owners and operators of a successful plumbing business in Richmond, Virginia. In 2005, the Peases, in relocating their family to Maryland, decided to sell their business in Virginia and purchase an existing plumbing business in Maryland. They eventually settled in Harford County, Maryland, and purchased a residence for $820,000, paying $300,000 in cash and financing the remaining $520,000. Around the same time, William learned from a business brokerage firm that David Kolper was seeking to sell his Maryland-based plumbing company, Bush Plumbing & Heating, Inc. (hereinafter "Bush"). The Peases established two entities, which they would own, to purchase Bush: VLP Industries, Inc., a Maryland corporation, and VLP Real Estate, LLC, a Maryland limited liability company. To finance the purchase of Bush, William contacted Wachovia to obtain an SBA loan. He was ultimately referred to Jeffrey [2]

---

**2.** It is not clear whether Mr. Martin's first name is correctly spelled "Jeffrey" or "Jeffery," as the Peases use both versions throughout their pleadings and briefs.

Martin (hereinafter "Martin"), Wachovia's agent, senior commercial business lender, and business development officer.

During the period between March and August of 2005, William alleged that he spoke with Martin at least twice a week, and repeatedly told Martin that he did not want his new residence to be "implicated in the financing or to, in any manner, pledge or utilize the new home as collateral toward repayment of the [SBA] loan." Allegedly, Martin informed William that, pursuant to Wachovia's normal lending procedures, the only way the Peases would not be required to pledge their house as collateral on the SBA loan was if they had less than twenty-percent equity in the value of the home. Because the size of the Peases' down payment put the amount of equity in the home above twenty percent, Martin suggested the Peases encumber the home with a home equity line of credit with Wachovia, which would decrease the amount of equity in the property below the twenty-percent threshold. The Peases applied for and received from Wachovia a $218,000 line of credit on their residence, which reduced their personal equity in the home to ten percent. The Peases contend that Wachovia and Martin misrepresented verbally that this "artificial loan" would safeguard the residence from foreclosure were the commercial loan to go into default and the personal guarantees triggered. In reality, however, because the commercial loan documents (including the guarantees) provided no such restriction on Wachovia's abilities to execute on the Peases' assets in the event of default, Wachovia could foreclose on the home under those circumstances notwithstanding the home equity loan gambit. Thus, the Peases allege that these statements regarding protecting the residence from foreclosure were made to induce them into agreeing to enter the SBA loan.

At the same time, William began the process of reviewing the business affairs and finances of Bush to ensure the company was valued as estimated by Kolper. According to William, as part of his due diligence in reviewing the business affairs and finances of Bush, he required Kolper and the business brokerage firm to provide various documentation, including:

profit and loss statements for the duration of Bush's operations, prior tax returns, a list of employees, a list of contracts, a list of accounts receivables, and various other documentation. Such documentation was submitted to Wachovia's certified appraiser, Scott Gabehart, who, after conducting an independent financial analysis for Wachovia and the Peases, valued Bush at $950,000 as a going concern. Further, a separate real estate appraiser valued the real property on which the Bush business was located at $450,000.

A few weeks prior to settlement on the SBA loan, Martin allegedly admitted to William that, according to the documentation supplied to Wachovia, Bush's financial health was weaker than Kolper had indicated. A centerpiece of the Peases' grievance is the allegation that Wachovia possessed certain negative financial information that it withheld from them.[3] Allegedly, the Peases did not discover this negative financial information until after settlement. They claim that they would not have proceeded with the purchase of Bush had they known of the later-discovered negative financial information. In any event, because the financial state of Bush was not as Kolper had stated, Martin classified the proposed transaction as a "very tight" deal; that is, he was not sure whether Wachovia would approve the SBA loan now. The Peases allege that Martin urged William to cause VLP Industries, Inc. to execute a promissory note in the amount of $95,000, payable to Kolper, as additional financing for the purchase of Bush and as a way to ensure that Wachovia could authorize the financing for the balance of the purchase price. Allegedly,

---

3. At oral argument, Peases' counsel admitted that he was not sure exactly what additional negative financial information was withheld. Furthermore, it is not clear whether the alleged withheld information was information *in addition* to that relied on by Wachovia's appraiser. At oral argument, Peases' counsel stated that "there was, we believe, additional information beyond what was done in the appraisal ... that was received by ... the loan officer in this case." On the other hand, in the affidavit supporting his motion to open, modify, or vacate the confessed judgment, William states merely that "Wachovia never provided to [sic] the negative financial information about the Bush purchase [to] its borrower, VLP Industries, or to William Pease and Michele Pease."

Martin represented verbally to William that the $95,000 promissory note would be "hold-back money" that the Peases could utilize in the event that Bush incurred any liability as a result of its operations prior to the transfer of Bush. While Martin characterized this "hold-back money" as a safety precaution to protect against any outstanding issues associated with the purchase of Bush, the Peases maintain that this loan was merely a device for Wachovia to shift some of the risk exposure on the SBA loan from itself to the Peases.

Settlement on the purchase of Bush took place on 19 August 2005, whereby Bush's operating assets were transferred to VLP Industries, Inc., and the real property on which Bush was situated was transferred to VLP Real Estate, for a total purchase price of $1,494,075.49. On the same day, to finance the majority of the purchase price, VLP Industries, Inc. executed a commercial loan with Wachovia in the amount of $1,118,300. The Peases personally guaranteed the loan, and both William and Michele signed the loan agreement, which contained the following confessed judgment clause:

CONFESSION OF JUDGMENT. If payment of the indebtedness ... shall not be made when due and at maturity ... the undersigned hereby authorize and empower any attorney of any Court of Record within the United States to appear for the undersigned in any Court ... and confess judgment against the undersigned either jointly or severally in favor of the Holder of this Note for the amount then due thereon, with the interest thereon aforementioned and the cost of suit and attorneys' fees of fifteen percent (15%)....

Less than one week after settlement, the Peases paid back the $218,000 home equity loan, plus $2,570.74 in related loan fees and interest. On the $95,000 hold-back note, however, the Peases made no payments to Kolper. Further, on 30 November 2007, VLP Industries, Inc. defaulted on the commercial loan, on which $1,112.312.34 was owed at that time. On that same date, Wachovia accelerated the commercial loan and informed both William and Michele of their obligation to pay the outstanding amount in full. On 28 January 2008, having not received the accelerated payments, Wachovia insti-

tuted confessed judgment proceedings in the Circuit Court for Baltimore City. Confessed judgments for $1,285,995.28 were entered and indexed against the Peases and both of their business entities on 28 January 2008.[4]

The Peases filed a motion to open, modify, or vacate the confessed judgments on 8 April 2008, asserting allegations of negligence, fraud, and breach of fiduciary duty. In support of these allegations, the Peases attached an affidavit by John Burdiss, a purported expert in banking standards of care. Burdiss claimed that Wachovia failed to comport with commercially reasonable banking standards when it authorized the commercial loan, despite having reservations about Bush's financial stability, and when it induced the Peases into taking out the home equity loan by assuring them that, by doing so, their residence would be protected from foreclosure. Wachovia responded by arguing that the Peases' defenses of negligence, fraud, and breach of fiduciary duty were barred by the Maryland Credit Agreement Act, which states that "[a] credit agreement is not enforceable ... unless it is ... [i]n writing ...." § 5–408(b).

On 10 December 2008, a hearing on the motion to open, modify, or vacate the confessed judgments was held in the Circuit Court. Before the trial court, the Peases asserted that, should the hearing judge order the confessed judgment opened, modified, or vacated, they would file counterclaims against Wachovia,[5] yet they informed the hearing judge also that they would argue that the SBA loan agreement was void *ab initio* for the same reasons as supported the tort claims. After listening to both sides, the hearing judge denied reluc-

---

4. Though it perhaps does not require stating, the $95,000 note from VLP Industries, Inc., payable to Kolper, was not part of the indebtedness under the commercial loan default that lead to the confessed judgments.

5. The Peases' trial counsel stated expressly to the hearing judge that, "[i]f you decide to vacate the Judgment, we will then file our counterclaim in this case." Further, when asked by the hearing judge whether the Peases would file tort claims, Peases' counsel replied, "[w]e're asserting all tort claims. Yes, Your Honor."

tantly the Peases' motion, believing he was bound by the reasoning contained in a Court of Special Appeals's case, *ST Sys. Corp. v. Md. Nat'l Bank,* 112 Md.App. 20, 684 A.2d 32 (1996): [6]

> I am going to deny the Motion to Vacate. And I do so with a good deal of reluctance.... The Court need only find there is a potentially meritorious defense, not to determine the amount of merit, or that the moving party will indeed prevail.... And, while I would certainly find that the Plaintiff would be, I believe be able to present a defense that in terms of having been induced by perhaps misrepresentation.... I just cannot find that in light of the Maryland Credit Agreement Statute, and particularly in light of the ST Systems Corporation vs. Maryland National Bank case.... And I too, as an individual would hope that the statute would not be such a shield as to protect lending institutions from any tort....

---

**6.** In *ST Sys. Corp. v. Md. Nat'l Bank,* 112 Md.App. 20, 684 A.2d 32 (1996), Maryland National Bank (MNB) offered a commercial-financing package to ST Systems Corporation (STX), part of which was conditioned upon STX having a value of at least $40,000,000. *ST Sys. Corp.,* 112 Md.App. at 25, 684 A.2d at 34. Because STX as a going concern ultimately was valued at an amount less than that, the parties began negotiating a new commercial-financing package. *ST Sys. Corp.,* 112 Md.App. at 25, 684 A.2d at 35. The parties never executed a loan agreement memorializing the terms of a restructured package, however. *See ST Sys. Corp.,* 112 Md.App. at 26, 684 A.2d at 35. STX filed suit against MNB, asserting, *inter alia,* eight separate tort claims based on MNB's conduct during the loan negotiation process. *Id.* MNB filed a motion to dismiss these tort claims, arguing that the Maryland Credit Agreement Act barred STX's tort claims that were related directly to the non-memorialized—and thus unenforceable—agreement. *See id.* The Court of Special Appeals explained that the Maryland Credit Agreement Act is "intended to limit the increase in lender liability litigation," and that the statute "has broad language that appears to incorporate an expansive view of limiting lender liability...." *See ST Sys. Corp.,* 112 Md.App. at 31, 684 A.2d at 37. Ultimately, the Court of Special Appeals held that "[a]llowing enforcement of tort claims based on an unenforceable oral agreement would invalidate [the Act] by nullifying its protective purpose ...." and that the Act's "economic protective policy is *only* upheld if tort claims based on an unenforceable alleged agreement are excluded." *See ST Sys. Corp.,* 112 Md.App. at 32, 684 A.2d at 38. *See infra* note 12.

Yet, I am merely sitting in the Circuit Court and have been compelled to follow the dictates of the opinions of the Appellate Court. And, my understanding of what the Court of Special Appeals has said is literally the economic protective policy of the Maryland Credit Agreement statute is only upheld if tort claims based on an unenforceable alleged agreement are excluded and the torts that are alleged here as the potentially meritorious defenses are indeed based upon unenforceable alleged agreements.

The Peases appealed timely to the Court of Special Appeals. On our initiative, we granted certiorari, before the intermediate appellate court could decide the appeal, to consider, if appropriate, whether

the [Maryland Credit Agreement Act] which bars enforcement of credit agreements, unless the agreements are in writing, and the CSA decision in [*ST Sys. Corp.*] prohibit tort claim defenses to a bank's confessed judgment claim where the defendants allege the bank violated standard banking practices to fraudulently and negligently induce a borrower to accept the bank's loan of over $1 million dollars.

*Pease v. Wachovia*, 409 Md. 413, 975 A.2d 875 (2009).

## DISCUSSION

### I. Standard of Review

■ Pursuant to Md. Rule 2–611(d), a court must open, modify, or vacate a confessed judgment "if [it] finds that there is a substantial and sufficient basis for an actual controversy as to the merits of the action. . . ." A trial court's legal conclusions—including whether the evidentiary proffers of a defendant seeking to open, modify, or vacate a confessed judgment qualify as a meritorious defense—are reviewed under non-deferential appellate scrutiny. *See Nils, LLC v. Antezana*, 171 Md.App. 717, 727–28, 912 A.2d 45, 51 (2006) ("On the issue of whether what is offered by a party seeking to open, modify, or vacate a confessed judgment qualifies as a meritorious defense, that is a question of law for the judge."); *Shafer Bros. v. Kite*, 43 Md.App. 601, 606, 406 A.2d 673, 676

(1979) ("The issue of what can constitute a meritorious defense, assuming that the supporting facts are believed, is a question of law.").

## II. Analysis

The Peases devote a portion of their brief to canvassing the legislative history of the Maryland Credit Agreement Act. Wachovia devotes most of its brief to arguing that the Maryland Credit Agreement Act bars consideration of the Peases' allegations and evidentiary proffers of alleged negligence, fraud, and breach of fiduciary duty. Read together, the parties' briefs ask, in effect, this Court to cut through what might be a Gordian Knot of statutory interpretation and determine whether § 5–408(b) bars consideration of the Peases' allegations and evidentiary proffers.

To be sure, "[c]onstruing statutes . . . is a large and essential part of the judicial process" and "[i]t is one of the principal functions which courts were created to perform. . . ." *Mangum v. Md. State Bd. of Censors*, 273 Md. 176, 192, 328 A.2d 283, 292 (1974); *see Atl. Sea–Con., Ltd. v. Robert Dann Co.*, 80 Md.App. 161, 165, 560 A.2d 592, 594 (1989), *rev'd on other grounds*, 321 Md. 275, 582 A.2d 981 (1990). Wading up to our eyebrows in the waters of statutory interpretation,[7] however,

---

7. The Concurring and Dissenting opinion's efforts to grapple with the Maryland Credit Agreement Act's plain language, legislative history, and how other jurisdictions may have treated debatably similar facts under arguably similar statutory schemes, where not entirely necessary, call to mind the story of the Exodus. The Midrashic interpretation of the Exodus from Egypt recounts that, upon reaching the Red Sea, the waters did not automatically part before the Israelites. MIDRASH RABBAH, VOL. III 272 (S.M. Lehrman, trans., 3d ed.1983). While the Israelites stood by the shore contemplating their impending doom, Nahshon Ben Amminadab entered the water until the sea reached his nostrils. THE JEWISH ENCYCLOPEDIA VOL. IX 146 (Funk & Wagnall 1905); MIDRASH RABBAH, *supra*. It was not until this act of self-sacrifice that the sea's waters parted. Imagine, however, that there was a way for the Israelites to continue on their path without having to wade in water over their heads. The Concurring and Dissenting opinion here takes on the Maryland Credit Agreement Act at least up to its eyebrows; we wade in, however, only up to our nostrils.

is not required where the perceived-as-relevant statutory provision does not control the alleged facts of a given case. *See Boffen v. State,* 372 Md. 724, 736, 816 A.2d 88, 95 (2003) (quoting *Chen v. State,* 370 Md. 99, 106, 803 A.2d 518, 521–22 (2002)) ("In discerning legislative intent, 'we look first at the language of the *relevant* statutory provision or provisions.' ") (emphasis added).

Pertinent to our case, and pursuant to Md. Rule 2–611(d), we are alert to the fact that the practical effect of a hearing judge opening, modifying, or vacating a confessed judgment is to "permit the defendant to file a responsive pleading." Admittedly, at this juncture in these proceedings, it is a bit unclear upon what grounds that pleading would be based and what its aim might be. The lack of clarity is occasioned by, on one hand, the Peases arguing before the trial court, and reiterating in their brief before this Court, that, if the judgments are opened, modified, or vacated, they intend to file counterclaims against Wachovia, asserting the same tort-based theories raised before the trial court and this Court: negligence, fraud, and breach of fiduciary duty. On the other hand, before the hearing judge, the Peases also acknowledged that they would seek to have the credit agreement declared void *ab initio* for the same reasons. At oral argument here, the Peases' counsel stated that "the defenses in this case ... create a tort defense *to the creation* of the promissory note." [8]

We regret that the quality of our abridged analysis apparently does not meet the more rigorous standards expected by the subscribers to the Concurring and Dissenting opinion. *See* 416 Md. 211, 233, 6 A.3d 867, 880 ("[T]his argument merits more discussion than the brief treatment that the majority opinion accords it."); 416 Md. at 237, 6 A.3d at 882 ("[A] more careful examination ... is key to this appeal.").

**8.** The Concurring and Dissenting opinion highlights a different colloquy at oral argument between the Peases' counsel and Judge Murphy to support its view that we should decline to address the Peases' pursuit of a void *ab initio* claim. 416 Md. 211, 234 n.1, 6 A.3d 867, 880–81 n.1 (2010). Apparently, Judge Adkins hears the Peases' counsel say, on the recording of oral argument, "we challenged that the loan that was executed, through the negligence or through fraud, was improperly created and therefore could either be void *ab initio* or as a setoff," and

(Emphasis added.) Thus, it is not clear then or now whether the Peases' incipient responsive pleading would assert that they are entitled to damages, notwithstanding the enforceability of the credit agreement, or whether they will argue the credit agreement represented by the SBA commercial loan and guarantees is not enforceable in the first instance. Because different outcomes, vis á vis the application of the Maryland Credit Agreement Act, might result from these alternative approaches, after determining precisely the situations to which the General Assembly intended the Act apply, we will address the (1) counterclaims and (2) the void *ab initio* objectives in turn.

---

infers from the past-tense of the verb "challenged" that the Peases only pursued the void *ab initio* objective before the Circuit Court, but not before this Court. *Id.* (first emphasis added). After our careful review of the oral argument recording, we hear the Peases' counsel utter the word "challenge" (the present tense); thus, we understand the Peases' counsel to mean that he is currently—before this Court—arguing that, upon remand, the Peases be allowed to seek a declaration that the SBA loan was void *ab initio* (or voidable).

Notwithstanding our difference of opinion about which tense the verb "challenge" took in the exchange between counsel and Judge Murphy, the Peases' counsel—during what seems elsewhere on the recording of oral argument to be part of his prepared arguments, and not in direct response to an inquiry by a member of the Court—unequivocally states that it was his belief that the defenses asserted by his clients (then and now) operate to void the SBA loan *ab initio*. Finally, the Peases' counsel, in his brief at 19, cites a Law Review article for the proposition that "[f]raud may serve both as a defense to a suit on a contract and as an independent tort." Todd C. Pearson, *Limiting Lender Liability: The Trend Toward Written Credit Agreement Statutes*, 76 Minn. L.Rev. 295, 314–15 (1991).

Concededly, while the Peases' counsel could have been clearer before this Court that, upon remand, his clients intend to pursue the void *ab initio* claim before the Circuit Court, when viewing the proposition that "fraud may serve ... as a defense to a suit on a contract" through the lens of what was argued in the trial court and at appellate oral argument, the more reasonable interpretation of the record is that the Peases, before this Court, argue that they be allowed to proceed anew before the Circuit Court, claiming, among other things, that the SBA loan was void from the inception (or was at least voidable). Accordingly, it is fair and proper to comment on that contention in this opinion.

### A. The Maryland Credit Agreement Act

The Maryland Credit Agreement Act, Md.Code (2006 Repl. Vol.), Courts and Judicial Proceedings Art., § 5–408, provides, in pertinent part, that "[a] credit agreement is not enforceable by way of action or defense unless it: (1) [i]s in writing; (2) [e]xpresses consideration; (3) [s]ets forth the relevant terms and conditions of the agreement; and (4)[i]s signed by the person against whom enforcement is sought." § 5–408(b). As one would expect, however, with a statute entitled the "Maryland Credit Agreement Act," the Act only serves as a statute of frauds with respect to "credit agreements." *See* Bill Analysis of H.B. 704 (1989) ("The intent of this bill is to establish a statute of frauds that makes certain *credit agreements* ... unenforceable unless they are in writing ....") (emphasis added). The Act provides that a "credit agreement" is a "covenant, promise, undertaking, commitment, or other agreement by a financial institution to: 1. [l]end money; 2. [f]orbear from repayment of money, goods, or things in action; 3. [f]orbear from collecting or exercising any right to collect a debt; or 4. [o]therwise extend credit." § 5–408(a)(2)(i). The Act goes on to explain that the term " 'credit agreement' includes agreeing to take or not to take certain actions by a financial institution in connection with an existing or prospective credit agreement." § 5–408(a)(2)(ii). Both the parties in this case and the Concurring and Dissenting opinion wrestle with the Maryland Credit Agreement Act without first considering a threshold issue: whether the Act even applies—in whole or in part—to the Peases' assertions of negligence, fraud, and breach of fiduciary duty.

The legislative history of the Act, though not extensive, illuminates the types of situations to which the General Assembly intended the Act apply. In 1989, at the time the legislation was enacted, "multimillion dollar lawsuits [were] being filed and recovery [was] being made based on alleged verbal promises to lend and based on modifications of existing loan agreements." Notes to H.B. 704 (1989). Thus, the purpose of the bill was to "protect lenders against claims that the lender made a verbal promise to loan money and then

refused to do so, or that the lender verbally agreed to extend the terms of a loan." Bill Analysis of H.B. 704 (1989). We interpret the plain language and the legislative history of the Maryland Credit Agreement Act consistently to mean that a court should only engage the statute of frauds portion of the Act when, either through affirmative claim or defense, a commercial borrower or lender either attempts to recover on a verbal promise to lend/borrow, or seeks to enforce a verbal modification of an existing credit agreement.

Md. Rule 2–611(d) requires a trial judge to find "that there is a substantial and sufficient basis for an actual controversy as to the merits of the action" before opening, modifying, or vacating the confessed judgment. If, however, the Maryland Credit Agreement Act bars admission of certain evidence supporting the "basis for an actual controversy," it logically follows that such evidence is not, then, "substantial and sufficient." We now move to apply our understanding of the Maryland Credit Agreement Act to the (1) potential counterclaims and (2) the void *ab initio* objective, both asserted by the Peases before the trial court and this Court, as the theories upon which a future "responsive pleading" might be based, to determine whether the Act bars consideration at this stage of the proceedings of allegations and evidentiary proffers supporting either or both such objectives.

### B. As Counterclaims

As explained *supra,* the Peases assert that, if successful in opening or vacating the confessed judgment, they will employ their allegations—negligence, fraud, and breach of fiduciary duty—as the bases for counterclaims against Wachovia. If the Act, however, would bar such counterclaims, or the evidence on which they rest, the allegations and evidentiary proffers cannot constitute a "substantial and sufficient basis as to the merits of the action" sufficient to open or vacate the confessed judgments. *See Schlossberg v. Citizens Bank of Md.,* 341 Md. 650, 656, 672 A.2d 625, 627 (1996) (stating that a confessed judgment can only be opened if "the defendant has a potentially meritorious defense"). As discussed *supra,* the

statute of frauds portion of the Act only applies in the first instance to bar assertion of the Peases' counterclaims if they constitute either an attempt to enforce either (1) an oral credit agreement; or (2) a verbal modification of their existing loan agreement. Simply put, in filing these counterclaims against Wachovia, the Peases would be doing neither.

The filing of offensive counterclaims using the tort theories of negligence, fraud, and breach of fiduciary duty would be on the basis that, as the Peases acknowledge, any recovery on such claims would serve as a set-off against any judgment on the guarantees in favor of Wachovia.[9] Accordingly, where such counterclaims are allowed to be filed, the Peases would not seek thereby to enforce or modify an oral agreement, but would be asserting such claims notwithstanding the implicitly conceded enforceability of the credit agreement (the SBA commercial loan and guarantees). On the other hand, the legislative history of the Act is clear that, if the Peases were asserting the counterclaims as a means to defeat directly or attain a modification of the credit agreement with Wachovia, the Maryland Credit Agreement Act would be triggered and bar consideration of the underlying allegations and evidentiary proffers in determining whether the confessed judgments should be opened, modified, or vacated.[10] *See* Notes to H.B.

---

**9.** "Counterclaim" has been defined as "the assertion of a right to have an affirmative judgment against the adversary *based upon a setoff....* " *Imbesi v. Carpenter Realty Corp.,* 357 Md. 375, 380, 744 A.2d 549, 552 (2000) (emphasis added).

**10.** Wachovia misplaces its reliance on a recent decision of the United States District Court for the District of Maryland, *Kuechler v. The Peoples Bank,* 602 F.Supp.2d 625 (D.Md.2009). In *Kuechler,* the Plaintiffs took out a $500,000 commercial loan used to purchase a piece of property. *Kuechler,* 602 F.Supp.2d at 627. The Plaintiffs' personal guarantee on the loan was secured by an indemnity mortgage on both their personal residence and the to-be-purchased property. *Id.* After the borrower defaulted, Peoples Bank demanded full payment on the Plaintiffs' guarantee. *Kuechler,* 602 F.Supp.2d at 628. In response, the Plaintiffs sued Peoples Bank, alleging, *inter alia,* that the bank engaged in illegal bank practices, professional negligence, and intentional and negligent misrepresentation in underwriting the loan. *Kuechler,* 602 F.Supp.2d at 631. The Plaintiffs premised these lender-

704 (1989) ("[A]ll this legislation is saying is that . . . if you are going to sue me to enforce an alleged loan agreement, get it in writing and get it signed.").[11] Because the Peases would be asserting the counterclaims against Wachovia for negligence, fraud, and breach of fiduciary duty, not to enforce a verbal agreement to borrow or to modify their existing agreement to borrow, but to constitute a set-off against any recovery obtained by Wachovia under a concededly enforceable credit agreement, these counterclaims plainly are not the sort of situation to which the General Assembly intended the Act apply.[12] *See* Steven C. Bahls, *Farm and Ranch Credit:*

liability claims on allegations that "Peoples Bank, in order to induce Plaintiffs to execute the mortgage on their home, assured them that the foreclosure sales proceeds of the . . . Property would be applied against the $500,000 loan." *Kuechler,* 602 F.Supp.2d at 628. Such an allegation, however, was at odds with the express language of the credit agreement. *Kuechler,* 602 F.Supp.2d at 632. Judge J. Frederick Motz held that "Peoples Bank's promise to take or not to take certain actions, such as foreclosing on the Davidson property before foreclosing on the Kuechler's residence . . . . was not in writing, it is [therefore] not enforceable." *Id.* In effect, the Plaintiffs' claim in *Kuechler* was essentially that the bank's inducements and assurances effectuated a modification of the original credit agreement. *See id.* Of course, the legislative history of the Maryland Credit Agreement Act is clear that such alleged modifications are unenforceable unless in writing. As noted *supra,* in the case *sub judice,* however, to the extent that the Peases seek to assert counterclaims against Wachovia, they are not alleging that the alleged tortious acts of negligence, fraud, and breach of fiduciary duty effectuated a modification of their credit agreement with Wachovia.

11. Not all jurisdictions have held that offensive use of counterclaims are allowed under their respective credit agreement statutes of frauds. For instance, Illinois's credit agreement statute of frauds, 815 ILL. COMP. STAT. 160/2 (2007), which bars actions by a debtor "on or in any way related to a credit agreement," has been held to bar counterclaims related to a written credit agreement. *See First Nat'l Bank in Staunton v. McBride Chevrolet,* 267 Ill.App.3d 367, 204 Ill.Dec. 676, 642 N.E.2d 138, 142 (1994) ("There is no limitation as to the type of actions by a debtor which are barred by the act, so long as the action is in any way related to a credit agreement."). Because the Maryland Credit Agreement Act, however, is not as broadly worded, we do not need to construe similarly our statute to bar counterclaims, even if they are, in some way, related to the transaction leading to the execution of the written credit agreement.

12. Thus, we do not agree with the view, espoused by the Court of Special Appeals in *ST Sys. Corp. v. Md. Nat'l Bank,* 112 Md.App. 20, 32,

*Duty–Based Theories of Lender Liability,* 19 WM. MITCHELL L.REV. 367, 399 (1993) ("Since many . . . claims do not seek to establish or modify a credit agreement, the [credit agreement] statutes may not apply."). As such, § 5–408(b), which serves as the Act's statute of frauds, does not bar at the threshold the Circuit Court from considering the Peases' allegations—in assessing the legal sufficiency of whether the appropriate legal theory of each counterclaim states a prima facie cause of action—as grounds to open, modify, or vacate the confessed judgment.[13]

---

684 A.2d 32, 38 (1996), that the Act's "economic policy is *only* upheld if tort claims based on an unenforceable alleged agreement are excluded." (Emphasis in original.)

**13.** It is worth noting that a recent decision from the United States District Court for the Western District of Missouri concluded that Missouri's Credit Agreement Act did not apply, in the first instance, to tort allegations similar to those before us. In *Four A's Investment Co., LLC v. Bank of Am. Corp.,* 2010 WL 2720713, 2010 U.S. Dist. LEXIS 66976 (W.D.Mo. 6 July 2010), a borrower sued Bank of America for negligent misrepresentation, fraudulent misrepresentation, negligence, and breach of covenant, stemming from the borrower's desired loan from Bank of America. Specifically, the borrower alleged that the bank "made oral representations that the loan would be approved within a certain time" and that the bank "misrepresented the status of the loan when asked about why the process was taking so long." *Four A's Investment Co., LLC,* 2010 WL 2720713, at *4, 2010 U.S. Dist. LEXIS 66976, at *12. In response to these allegations, Bank of America asserted that, because the borrower was seeking a commercial loan, Missouri's Commercial Credit Agreement Statute of Frauds, MO.REV. STAT. § 432.047, which provides that "[a] debtor may not maintain an action upon or a defense . . . in any way related to a credit agreement unless the credit agreement is in writing . . .", barred such claims. In response, the borrower argued, *inter alia,* that "their common law theories have nothing to do with a credit agreement, but rather with the way the loan process was conducted" and that "their suit is independent of any . . . credit agreement." *Four A's Investment Co., LLC,* 2010 WL 2720713, at *4, 2010 U.S. Dist. LEXIS 66976, at *13. The court ultimately held that "because [the borrower is] not seeking to enforce an oral promise to loan money . . . MO.REV.STAT. § 432.047 *does not apply* to bar plaintiff's common law claims." *Four A's Investment Co., LLC,* 2010 WL 2720713, at *4, 2010 U.S. Dist. LEXIS 66976, at *14 (emphasis added). Similar to *Four A's Investment Co.,* the Peases, if successful in opening the confessed judgment, seek to use the common law tort theories as an offensive maneuver. Thus, because both cases deal with assertions "hav[ing] nothing to do with a credit agreement, but rather with the way the loan process was conducted", *Four A's*

## C. As Void *Ab Initio* [14]

The Peases assert in the alternative that, if successful in opening or vacating the confessed judgments, they will use their allegations—sounding in negligence, fraud, and breach of fiduciary duty—as the bases for arguing that the SBA loan agreement and guarantees were void *ab initio*. As above, if the Act would bar the consideration of such parol evidence where the objective is to show that the credit agreement was void *ab initio*, then the parol evidence on which such a theory rests cannot constitute a "substantial and sufficient basis as to the merits of the action" sufficient to open the confessed judgment. Because we believe that the Act applies to bar evidence aiming to show that a credit agreement is void *ab initio*, we hold that such parol evidence cannot constitute a "substantial and sufficient basis as to the merits of the action," and is therefore barred from consideration in the context of deciding whether to grant a motion to open, modify, or vacate a confessed judgment based on the credit agreement.

---

*Investment Co., LLC*, 2010 WL 2720713, at *4, 2010 U.S. Dist. LEXIS 66976, at *13, *Four A's Investment Co., LLC* bolsters the view that the Maryland Credit Agreement Act does not apply to the facts before us. *See also King v. Parish Nat'l Bank*, 885 So.2d 540 (La.2004) (holding the Louisiana credit agreement statute, LA.REV.STAT. ANN. § 6:1122 (2008), inapplicable to allegations of bad faith that were separate from any credit agreement).

**14.** According to the Concurring and Dissenting opinion, we fail "to recognize that a successful claim of fraudulent inducement renders the contract voidable, not void *ab initio*." 416 Md. 211, 234, 6 A.3d 867, 881. It is not that we "fail to recognize" this apparently well-settled rule of law; rather, we view it as immaterial. That is, the Maryland Credit Agreement Act applies to bar certain evidence notwithstanding the likelihood of success in utilizing that evidence to prove a certain legal theory. Thus, it is immaterial that the Peases would be unsuccessful in using such evidence to prove that the SBA loan was void *ab initio*; rather, the only issue is whether, in so arguing, the Peases would be seeking to enforce a modification of the SBA loan agreement. Because we hold that they are *seeking* to enforce a modification of the agreement, the Act applies to bar the admission of the proffered evidence, regardless of whether they could be successful in actually enforcing such a modification.

■ Again, the Act would only bar the Peases' parol evidence tending to show the loan agreement was void *ab initio* if the admission of such evidence constitutes an attempt to enforce either: (1) an oral credit agreement; or (2) a verbal modification of their existing credit agreement. Here, while consideration of such evidence to nullify the credit agreement is not an attempt to enforce an oral credit agreement, we think it is an attempt to enforce a verbal modification of the credit agreement existing between the Peases and Wachovia. We explain.

The SBA note and the accompanying guarantees set forth the rights and duties of the Peases and Wachovia. These rights and duties include, in pertinent part, the Peases' duty to repay Wachovia $1,118,300, and, if default and acceleration occur under the note, failing repayment, Wachovia's right to execute on the guarantors' assets, including the real property upon which Bush is situated and the Peases' residence. The Peases' attempts to declare the credit agreement void *ab initio,* at least on the bases appearing in this record, constitute an attempt to have a court declare that they need not pay back the $1,118,300 and/or that Wachovia may not execute on the borrowers' or the guarantors' assets; as such, the Peases are arguing for the enforcement of what is, in effect, an oral modification of the original terms of the loan and guarantees. This is precisely the type of maneuver that the statute of frauds portion of the Maryland Credit Agreement Act was enacted to forestall. *See* Notes to H.B. 704 ("Multimillion dollar lawsuits are being filed and recovery is being made based on ... modifications of existing loan agreements.").

## D. Summary

This case requires this Court to consider the interplay between the law and rules governing confessed judgments and the Maryland Credit Agreement Act. "Judgments by confession are not favored in Maryland because Maryland courts have long recognized that the practice of including in a promissory note a provision authorizing confession of judgment lends itself far too readily to fraud and abuse." *Garliss*

*v. Key Fed. Sav. Bank,* 97 Md.App. 96, 103, 627 A.2d 64, 68 (1993) (citation omitted). Not surprisingly then, Md. Rule 2–611(e) provides that "the court *shall* order the judgment by confession opened," upon showing of a "substantial and sufficient basis for an actual controversy as to the merits of the action...." (Emphasis added.) A party can only successfully show the requisite "substantial and sufficient basis," however, if the allegations and evidentiary proffers supporting such a basis will be arguably admissible. It is at this juncture that the Maryland Credit Agreement Act becomes relevant. That is, if the statute of frauds section of the Maryland Credit Agreement Act would apply to bar consideration of certain parol evidence at the merit-stage of the litigation, such evidence may not be considered in deciding a motion to open, modify, or vacate a confessed judgment.

We hold that the General Assembly did not intend the Maryland Credit Agreement Act to apply to a borrower asserting tort counterclaims against a lender, even where the asserted factual underpinnings of the tort or torts derive from transactions relating to the execution of the credit agreement. As such, to the extent the Peases' responsive pleading will assert counterclaims against Wachovia, the evidentiary proffers upon which these counterclaims appear to be based are not barred by the statute of frauds provision of the Maryland Credit Agreement Act from consideration in deciding whether to open or vacate the confessed judgment.[15] Accordingly, the Circuit Court erred in refusing to consider whether the Peases' allegations and evidentiary proffers plead sufficiently and substantially an actual controversy. To the extent, however, that the Peases claim that the SBA loan agreement was void *ab initio,* they ask the court effectively to enforce an oral modification of their written credit agreement. Because the applicable statute of frauds applies to bar a party from effectuating the enforcement of a claimed oral modification,

---

**15.** This Court expresses no opinion as to whether the Peases will be successful in satisfying the trial court that there exists a "substantial and sufficient basis for an actual controversy as to the merits of the action," as required by Md. Rule 2–611(e).

the evidence upon which such an argument rests would be, in that instance, inadmissible.

In the Circuit Court, the hearing judge conceded that, but for his determination that he could not consider the Peases' factual allegations and evidentiary proffers at the threshold, he "would certainly find that the Plaintiff would be . . . able to present a defense . . . by perhaps misrepresentation about the home being used as collateral. . . ." Because he did not make a determination whether, pursuant to Md. Rule 2–611(d), there exists in this case a "substantial and sufficient basis for an actual controversy as to the merits of the action," we remand the case, in light of this opinion, so that the court may consider whether the Peases' allegations of negligence, fraud, and breach of fiduciary duty meet this threshold.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE ASSIGNED 50% TO THE PEASES AND 50% TO WACHOVIA.**

BELL, C.J., MURPHY and ADKINS, JJ., concur and dissent.

ADKINS, J., concurring in part and dissenting in part.

I agree with the majority's conclusion that the Maryland Credit Agreement Act does not apply to, and therefore does not preclude, the Peases' counterclaims of fraud, negligence, and breach of fiduciary duty, although I think its reasoning should be amplified. I disagree, however, with the majority's holding that the use of oral statements to prove that a contract is void *ab initio* is barred by the Act.

## I.

In its holding that tort claims are not barred by the Act, the majority relies primarily on legislative history indicating that the Act was intended only to apply to bar enforcement of "(1)

an oral credit agreement; or (2) a verbal modification of their existing credit agreement." The majority emphasizes that the Act was enacted in response to the numerous "multimillion dollar lawsuits [that were] being filed . . . based on alleged verbal promises to lend and . . . modifications of existing loan agreements." Maj. Op. at 224, 6 A.3d at 875 (quoting Notes to H.B. 704 (1989)). I would explore, which the majority does not, how this legislative history is helpful to interpreting specific words of the Act.

Specifically, I believe that the legislative history sheds light on the meaning of "enforceable" as used in Subsection (b) of the Act—"a credit agreement is not enforceable by way of action or defense[.]" Maryland Code, (1973, 2006 Repl.Vol.), § 5–408 of the Courts and Judicial Proceedings Article ("CJP"). The Act defines "credit agreement" to include "agreeing to take or to not take certain actions by a financial institution in connection with an existing or prospective credit agreement." CJP § 5–408(a)(ii). It then provides that a "credit agreement" is not "enforceable by way of action or defense" unless it is in writing. CJP § 5–408(b)(1). Wachovia argues that these provisions mean that any oral agreement or representation made by a bank in connection with a loan is barred, even when used to support a tort action. Thus, Wachovia interprets the word "enforce" to include an action in tort based on the oral agreement. This was the interpretation reached in *ST Systems v. Md. Nat'l Bank,* 112 Md.App. 20, 32, 684 A.2d 32, 38 (1996). Under this construction, a suit for damages in tort would "enforce" the oral agreement in the sense that it would impose liability on the bank for breaching the agreement. In my view, this argument merits more discussion than the brief treatment that the majority opinion accords it. I set forth my reasons for rejecting Wachovia's argument in Section II hereof. Ultimately, though, I agree with the majority that the Act does not bar suits or counterclaims for damages in fraud, negligence, or breach of fiduciary duty.

I depart from the majority when it veers into discussion of an argument that the contract is void *ab initio*,[1] and holds that the Act would bar such a claim. First, the majority fails to recognize that a successful claim of fraudulent inducement renders the contract voidable, not void *ab initio*. *See Julian v. Buonassissi*, 414 Md. 641, 667, 997 A.2d 104, 119 (2010) ("We have long recognized that contracts obtained by fraud are not absolutely void, but are voidable at the election of the parties affected by the fraud[.]") (internal quotations and citations omitted); *Wenstrom Consolidated Dynamo & Motor Co. of Balt. City v. Purnell*, 75 Md. 113, 120, 23 A. 134, 136 (1891) ("[W]here a [party] has been deceived and induced to enter into a [contract], by misrepresentation and fraud ..., such contract, while not absolutely void, is voidable[.]"); Restatement (Second) of Contracts Section 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").[2] According to the Restatement,

---

1. The Peases do not argue in their briefs that the loan was void *ab initio*, mentioning the phrase in their brief only as part of their review of what they filed in the Circuit Court. At oral argument, the following colloquy occurred:

    Judge Murphy: [How does this case] play into the line of cases that say when there is a motion to reopen we apply a pretty liberal standard to allowing a hearing on the merits?

    Counsel for Peases: Correct your honor, the line of cases indicates that confess judgments are freely opened upon a showing of a meritorious defense. A meritorious defense is described in [*Nils, LLC v. Antezana*, 171 Md.App. 717, 912 A.2d 45,] a defense that challenges the execution of the loan or the amount due under the note. We challenged that the loan that was executed, through the negligence or through fraud, was improperly created and therefore could either be void *ab initio* or as a setoff. In the event of a set-off, courts have stated that set-off is a meritorious defense. It is required under the Rule 6–11(c) that by motion of the defendant ... shall state a legal and factual basis for defense of that claim.... The defenses in this case that we claimed ... create a tort defense to the creation of the promissory note.

    Presumably the majority relies on counsel's mention of the term as the justification for reaching the issue, even though it is not argued in the Peases' briefs. I would not do so.

2. The Restatement (Second) of Contracts (1981) gives the following example of a void contract in Section 163, Illustration 2:

the same would be true in a successful claim of negligent material misrepresentation inducing a contract. *See* Restatement (Second) of Contracts § 164 cmt. b (1981) ("A representation need not be fraudulent in order to make a contract voidable under the rule stated in this Section. However, a non-fraudulent misrepresentation does not make a contract voidable unless it is material, while materiality is not essential in the case of a fraudulent misrepresentation.").[3] Thus, this case presents no issue about the effect of the Maryland Credit Agreement Act on credit agreements claimed to be *void ab initio.*

I also disagree with the majority's holding that the Act bars use of oral statements that would render a contract void *ab initio.* The majority reasons that any "consideration of [Wachovia's oral representations] to nullify the [commercial loan] ... is an attempt to enforce a verbal modification of the [commercial loan] existing between the Peases and Wachovia." Maj. Op. at 230, 6 A.3d at 878. This determination utterly misconstrues the doctrine of "void *ab initio.*"

---

A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read. B's apparent manifestation of assent is not effective.

**3.** The Peases may also encounter problems with a "voidable" theory, because they would seek to void a loan agreement where they had already received the money. We have previously recognized the restitution obligation of a party seeking rescission. *See, e.g., Lazorcak v. Feuerstein,* 273 Md. 69, 75–77, 327 A.2d 477, 481–482 (1974) ("[T]he party seeking rescission must indicate to the other party at least the intent to restore the parties to the relative positions which they would have occupied if no such contract had ever been made[.]") The court will relax the restoration requirement, but only in limited circumstances. *See Funger v. Mayor of Somerset,* 244 Md. 141, 151, 223 A.2d 168, 174 (1966) (listing seven situations in which rescission without restoration is appropriate). Under these standards, the Peases would presumably still have to account for the money they received if the contract were voided. Thus, the Peases' more viable claim is a set-off by way of a claim for damages.

When a contract is void *ab initio,* it is "[n]ull from the beginning, as from the first moment when a contract is entered into[.]" *Black's Law Dictionary* 1709 (9th ed.2009). It is as if the contract never existed in the first place. *Cf. Julian v. Buonassissi,* 414 Md. 641, 666, 997 A.2d 104, 119 (2010) ("A void contract 'is not a contract at all[.]'") (quoting Restatement (Second) of Contracts § 7 cmt. a (1981)). The contract never forms because there is no mutual assent, such as in situations where fraud in factum is alleged:

> At the heart of the assertion of [fraud in factum] is the absence of that degree of mutual assent prerequisite to the formation of a binding contract; absent the proverbial "meeting of the minds" one cannot be said to have obligated himself in law and the *purported transaction is regarded as void.*

Richard A. Lord, 26 *Williston on Contracts* § 69:4, at 502 (4th ed.2003)(quoting *Bancredit, Inc. v. Bethea,* 68 N.J.Super. 62, 172 A.2d 10, 12 (App.Div.1961)) (emphasis added). Thus, contracts that are void *ab initio* are not legally recognized:

> When deeds are … void *ab initio,* [they are] wholly wanting in legal fitness to stand even as security for advances. They have in truth *no lawful existence,* and to use the expression of Mr. Sugden, 525, "It would be wholly inconsistent and absurd to recognize them for any lawful purpose."

*Slingluff v. Smith,* 76 Md. 558, 560, 25 A. 674, 675 (1893) (emphasis added). As we said in *Western Maryland R. Co. v. Blue Ridge Hotel Co.,* 102 Md. 307, 331, 62 A. 351, 355 (1905), a contract that is void *ab initio,*

> will not be enforced by any species of action in a Court of Justice; … it cannot be made good by ratification, or by any succession of renewals, and no performance on either side, can give validity to the unlawful contract, or form the foundation of any right of action upon it.

(quoting 10 Cyc. 1146 (1904)).

The majority's reasoning is flawed. It characterizes a claim that a contract is void *ab initio* as one barred by the statute

because "it is an attempt to enforce a verbal modification of the credit agreement." Certainly, the Act bars using oral agreements to prove a contract modification in a suit to enforce the modified contract. "Modification," however, contemplates that there is something that is to be modified. *See Black's Law Dictionary* 1095 (9th ed.2009) (defining "modification" as a "change to *something* [.]") (emphasis added). If the claim is that a party's tortious conduct prevented the contract from ever forming at the outset, then there is simply nothing to enforce, and the Act does not apply. Accordingly, the Act would not bar a claim that a bank's tortious conduct rendered the original commercial loan void *ab initio.*

I respectfully dissent from the majority on this issue.

## II.

As the Circuit Court's analysis of the Peases' tort claims was overshadowed by its belief that the Maryland Credit Agreement Act categorically precluded the court from opening the confessed judgment, I believe that a more careful examination of that Act is key to this appeal. This Court has never before interpreted Maryland's Credit Agreement Act. As with any statute, the general principles of interpretation apply:

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions, and our analysis ends. If, however, the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the stat-

ute's legislative history, case law, and statutory purpose, as well as the structure of the statute.

*People's Ins. Counsel Div. v. Allstate Ins. Co.*, 408 Md. 336, 351–52, 969 A.2d 971, 979–80 (2009) (quotation marks and citations omitted).

The Maryland Credit Agreement Act was adopted in 1989 as a tool to limit lender liability.[4] *See* Senate Judicial Proceedings Committee, H.D. 704, 1989 General Assembly of Maryland Floor Report ("Floor Report"). It precludes a credit agreement from being enforceable "by way of action or defense unless it: (1) Is in writing; (2) Expresses consideration; (3) Sets forth the relevant terms and conditions of the agreement; and (4) Is signed by the person against whom its enforcement is sought." CJP § 5–408(b). Under the Act, a credit agreement "means a covenant, promise, undertaking, commitment, or other agreement by a financial institution to: 1. Lend money; 2. Forbear from repayment of money, goods, or things in action; 3. Forbear from collecting or exercising any right to collect a debt; or 4. Otherwise extend credit." CJP § 5–408(a)(2)(i). The term "credit agreement" also "includes agreeing to take or to not take certain actions by a financial institution in connection with an existing or prospective credit agreement." CJP § 5–408(a)(2)(ii).

---

**4.** Numerous jurisdictions across the country have enacted similar legislation. *See, e.g.,* Ala.Code § 8–9–2(7) (2010) (Alabama); Alaska Stat. § 09.25.010(a)(13) (2010); Ariz.Rev.Stat. Ann. § 44–101(9) (2010) (Arizona); Ark.Code Ann. § 4–59–101(d) (2010) (Arkansas); Colo.Rev.Stat. § 38–10–124 (2009) (Colorado); Conn. Gen.Stat. § 52–550(a)(6) (2010) (Connecticut); Fla. Stat. § 687.0304(2) (2009) (Florida); Idaho Code Ann. § 9–505 (2010); § 815 Ill. Comp. Stat. 160/2 (2010) (Illinois); Ind.Code § 26–2–9–4 (2010) (Indiana); Iowa Code § 535.17 (2009); Kan. Stat. Ann. §§ 16–117 through –118 (2009) (Kansas); La.Rev.Stat. Ann. § 6:1122 (2009) (Louisiana); Mich. Comp. Laws § 566.132 (2010) (Michigan); Minn.Stat. § 513.33 (2009) (Minnesota); Mo.Rev.Stat. § 432.045 (2009) (Missouri); Nev.Rev.Stat. § 111.220(4) (2009) (Nevada); N.C. Gen.Stat. § 22–5 (2009) (North Carolina); Okla. Stat. tit. 15, § 140 (2010) (Oklahoma); Or.Rev.Stat. § 41.580(1)(h) (2009) (Oregon); Tenn.Code Ann. § 29–2–101(b) (2010) (Tennessee); Tex. Bus. & Com. Code Ann. § 26.02 (Vernon 2009) (Texas); and Utah Code Ann. § 25–5–4 (2009).

According to the plain meaning of the Act, neither a commercial lender nor a commercial borrower may attempt to enforce an oral promise in an action on the contract. This bar includes any oral agreement to take or to not take certain actions in connection with an existing or prospective credit agreement. Thus, the Peases will not succeed in any claim that the promises made by Martin or Wachovia to forbear enforcing their judgment lien on the Peases's home constituted a modification of the terms of the commercial loan. The issue that is not so clear, however, is whether the statutory bar against using these oral promises in defense of a contract enforcement suit will bar their use in all other causes of action—such as the fraud, breach of fiduciary duty, and negligence claims that the Peases assert as set-offs, to the confessed judgment.

In examining this question, I see cases interpreting Maryland's general statute of frauds as apt guides. *See* CJP § 5–901. Indeed, legislative history reveals that the General Assembly enacted the Maryland Credit Agreement Act with the "intent ... to establish a statute of frauds ... [for] certain credit agreements made by financial institutions...." Floor Report, *supra.* Like the Act, CJP Section 5–901 requires that certain promises must be "in writing and signed by the party to be charged" to be enforceable.[5] The statute of frauds applies to any guaranty, agreement made on consideration of marriage, or agreement that cannot be performed within one year from the making of the promise. *See* CJP § 5–901.

In interpreting this general statute of frauds, we have drawn a distinction between actions in contract and those in tort, explaining that "contracts which are voidable by reason of the statute of frauds ... can still afford a basis for a tort action...." *Daugherty v. Kessler,* 264 Md. 281, 286, 286 A.2d 95, 98 (1972) (quotation marks and citation omitted). As

---

5. CJP Section 5–901 codified the common law rule. *See Collection & Investigation Bureau of Maryland, Inc. v. Linsley,* 37 Md.App. 66, 67–68, 375 A.2d 47, 48 (1977) (discussing the historical origins of Maryland's statute of frauds).

properly articulated by the CSA, "the statute of frauds does not bar a tort suit for either fraud or negligent misrepresentation because those counts are not based 'on . . . [the] contract' between the parties but are based on misrepresentations that induced the contract." *Greenfield v. Heckenbach,* 144 Md. App. 108, 140, 797 A.2d 63, 82 (2002) (*citing* 73 Am.Jur.2d *Statute of Frauds* § 492 (2001) ("tortfeasors and fraudulent intermeddlers will not be permitted to use the statute of frauds as a defense to a wrongful act or as a means of consummating a fraudulent design.")). Although not the only basis for my decision, this Court's previous treatment of our general statute of frauds lends support to a more narrow interpretation of the Maryland Credit Agreement Act.

Other states have also likened their credit agreement statutes to their general statutes of frauds, and on that basis reasoned that oral promises made in the context of a credit agreement could support tort claims. In Missouri, a credit agreement is an "agreement to lend or forbear repayment of money, to otherwise extend credit, or to make any financial accommodation" and a "debtor may not maintain an action upon or defense to a credit agreement unless the credit agreement is in writing. . . ." Mo.Rev.Stat. § 432.045 (2009). When debtors alleged that a lender had conspired to fraudulently induce them into defaulting on their loan by making promises to remove liens on another property, the Missouri Court of Appeals held that the trial court improperly granted summary judgment in favor of the lender based upon an erroneous belief that Missouri's credit agreement statute barred the debtors' claims. *See Mika v. Cent. Bank of Kansas City,* 112 S.W.3d 82, 90 (Mo.Ct.App.2003). The court explained that a fraud exception to the general statute of frauds had existed for over one hundred years in that state, and that there was nothing in the express language or the legislative history of the statute to indicate that the legislature intended a different rule to be applied to credit agreements. *Id.* Moreover, the court reasoned, it would work a "gross injustice" to allow the "application of the bar [to] itself work[ ] a fraud[.]" *Id.*

Likewise, the Oklahoma Supreme Court has ruled that "[s]tatutes of frauds are enacted to prevent frauds not to perpetrate them. Such statutes are not intended to be used as shield or breastwork for a wrongdoer." *Brown v. Founders Bank and Trust Co.*, 890 P.2d 855, 863 (Okla.1994). In *Brown*, the court held that Oklahoma's credit agreement statute did not bar a debtor's claim of fraud where the bank that provided the debtor's SBA loan dictated the location of the debtor's prospective construction project but did not disclose that it owned the land targeted for development. *Id.* at 859, 863. The Oklahoma credit agreement statute provides that

> No lender or borrower may maintain an action to enforce or seek damages for the breach of any term or condition of credit agreement ... unless such term or condition has been agreed to in writing and signed by the party against whom it is sought to be enforced or against whom damages are sought.

Okla. Stat. tit. 15, § 140(B) (2010).[6]

The same conclusion was reached in Connecticut, whose statute of frauds provides in relevant part:

> (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: ... (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

Conn. Gen.Stat. § 52–550(a)(6) (2010). In *Union Trust Company v. Jackson*, 42 Conn.App. 413, 679 A.2d 421, 425 (1996), the Connecticut Appellate Court reversed the trial court's grant of summary judgment in favor of a lender because the borrowers had presented evidence to create an issue of material fact regarding part performance, a common law exception

---

**6.** A credit agreement is defined as "an agreement by a financial institution to lend money, extend credit or otherwise make any other financial accommodation, or to renew, extend, modify, rearrange or forebear the repayment of any such loan, extension of credit or financial accommodation...." Okla. Stat. tit. 15, § 140(A)(1) (2010).

to the statute of frauds. Texas also joins this trend. Its statute provides that a "loan agreement [7] in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative." Tex. Bus. & Com.Code Ann. § 26.02(b) (2009). In *1001 McKinney Limited v. Credit Suisse First Boston Mortgage Capital,* 192 S.W.3d 20, 29–30 (Tex.App. 2005), the Court of Appeals held that Texas's credit agreement statute of frauds did not bar actions sounding in tort, including common law fraud, and thus grant of summary judgment on that issue in favor of the creditor was improper.[8] While not

---

7.  Texas defines a "loan agreement" as:

    ... one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation. The term does not include a promise, promissory note, agreement, undertaking, document, or commitment relating to:

    (A) a credit card or charge card; or

    (B) an open-end account, as that term is defined by Section 301.002, Finance Code, intended or used primarily for personal, family, or household use.

    Tex. Bus. & Com.Code Ann. § 26.02(a)(2) (2009).

8.  Michigan's intermediate appellate court adopted a different interpretation of its statute, which provides that "[a]n action shall not be brought against a financial institution to enforce ·... promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution...." Mich. Comp. Laws § 566.132(2) (2010). The statute governs promises to lend money, extend or modify credit, or waive a provision of a loan. *Id.* In *Crown Technology Park v. D & N Bank, F.S.B.,* 242 Mich.App. 538, 619 N.W.2d 66 (2000), the Michigan Court of Appeals held that the state's credit agreement statute barred a borrower's promissory estoppel suit because its language forbidding "an action" to enforce an oral credit agreement, without specifying the type of action prohibited, constituted an "unqualified and broad ban" of "*any* action." *Id.* at 72–73 (emphasis in original). There, the borrower alleged that the bank made representations that it would waive its prepayment penalty, leading the borrower to pay off the loan earlier than originally contracted. *Id.* at 69. The borrower also based its claim for negligence in the inducement on the same representations. *Id.* at 73–74. The court applied an identical analysis to that tort claim

all states embrace the reasoning of these cases,[9] I think this is the better-reasoned interpretation.

In still other states, legislatures have included more far-reaching language in their credit agreement statutes, which the courts have interpreted as barring all actions in tort related to unenforceable agreements. For example, Colorado's credit agreement statute precludes a debtor or a creditor

---

because it considered that claim to be "intimately related to [the borrower's] promissory estoppel argument" and was nothing more than "an action to enforce an oral promise[.]" *Id.* The court did make clear, however, that "[i]f a borrower ha[d] a separate claim for negligence that [did] not rely on enforcing the terms of an alleged oral promise, then [the statute would not be] a bar to adjudicating the claim on its merits." *Id.* at 73. I am not certain how to interpret this comment.

9. Some states have interpreted their credit agreement statutes to bar actions, counterclaims or cross claims, but not affirmative defenses. These states read the text of their statutes to prohibit "only debtor-initiated action against a creditor." *Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154, 159 (Ind.2005) (reversing trial court's grant of summary judgment in favor of creditor where debtor pled the affirmative defense of fraud in the inducement). In *Hibernia National Bank v. Contractor's Equipment & Supply*, 804 So.2d 760 (La.Ct.App.2001), Louisiana's intermediate appellate court allowed an alleged debtor to introduce evidence that she was no longer a guarantor on a loan which the bank sought to enforce against her in an action initiated by her creditor. One year later, however, the Louisiana Supreme Court refused to allow a debtor's claims for negligent misrepresentation and breach of fiduciary duty because La.Rev.Stat. Ann. Section 6:1122 "preclude[d] all actions for damages arising from oral credit agreements, regardless of the legal theory of recovery asserted." *Jesco Construction Corp. v. NationsBank Corp.*, 830 So.2d 989, 992 (La.2002). Florida's intermediate appellate court has similarly interpreted Section 687.0304 of the Florida Code to forbid counterclaims such as breach of an oral agreement, *Metro Building Materials Corporation v. Republic National Bank of Miami*, 919 So.2d 595 (Fla.Dist.Ct.App.2006), but not affirmative defenses such as waiver, estoppel and bad faith, *Brenowitz v. Central National Bank*, 597 So.2d 340 (Fla.Dist.Ct.App.1992). On the other hand, Minnesota courts deem Section 513.33 of the Minnesota Code to be a bar to the affirmative defenses of "unilateral and mutual mistake, no meeting of the minds, and contract modification," which sound in contract. *BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 902 (Minn.Ct.App.2010). That state is silent as to whether defenses sounding in tort would also be prohibited. Because Maryland's statute expressly prohibits defenses seeking to enforce an oral credit agreement, I do not focus on the distinction between debtor-initiated actions and affirmative defenses. *See* CJP § 5–408(b).

from "fil[ing] or maintain[ing] an action or a claim *relating to* a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." Colo.Rev.Stat. § 38–10–124(2) (2010) (emphasis added). Thus, in *Hewitt v. Pitkin County Bank & Trust Company,* 931 P.2d 456, 459 (Colo.App.1995), the Colorado Court of Appeals held that Colorado's credit agreement statute barred debtor's numerous tort claims because that state's legislature intended borrowers and lenders to "put it in writing," to ensure the enforceability of any claims they may have in the future. The Illinois credit agreement statute also contains the same expansive language: "A debtor may not maintain an action on or in any way *related to* a credit agreement unless the credit agreement is in writing . . . ." § 815 Ill. Comp. Stat. 160/2 (2010) (emphasis added). There, the intermediate appellate court interpreted the "related to" language to be a clear bar to actions based on the common law exceptions to that state's statute of frauds, including promissory estoppel and fraud. *See Klem v. First Nat'l Bank,* 275 Ill.App.3d 64, 211 Ill.Dec. 828, 655 N.E.2d 1211, 1212–13 (1995).

Additionally, when the American Bar Association's ("ABA") Task Force on Lender Liability Limitation Amendments to State Statutes of Frauds drafted its own model credit agreement statute, it chose language that expressly prohibited any "action for legal or equitable relief. . . ." John L. Culhane, Jr. & Dean C. Gramlich, *Lender Liability Limitation Amendments to State Statutes of Frauds,* 45 BUS. LAW. 1779, 1792 (1991). It then listed the type of actions forbidden, including "promissory or equitable estoppel[,]" "part performance[,]" and "negligent misrepresentation." *Id.* This was done in order to "foreclose 'end runs' under [common law] theories . . . [because] experience [told the Task Force] that borrowers [would] seek such relief, and that courts may sometimes afford such relief." *Id.* at 1797.

Our General Assembly, however, chose not to include words such as "relating to" or specify tort theories as among the

actions prohibited. The Maryland Act merely states that a credit agreement shall not be enforceable if it is not in writing. It contains no language indicating an intent to jettison all actions that rely on oral representations made in a commercial loan setting. If our General Assembly had intended the Credit Agreement Act to preclude tort actions, as did the ABA Task Force and the legislatures of Colorado and Illinois, then it could have drafted language to facilitate that end.

Timing and context are key to my interpretation—the Act was enacted after the tort exception to the general statute of frauds had already been established. *Compare Daugherty,* 264 Md. at 286, 286 A.2d at 98, *with* CJP § 5–408 (Act enacted in 1989, seventeen years after this Court's decision refusing to interpret the general Statute of Frauds as barring oral statements supporting tort actions). When analyzing a statute, "we presume that the Legislature has acted with full knowledge of prior and existing law, legislation and policy[.]" *Taylor v. Mandel,* 402 Md. 109, 131, 935 A.2d 671, 684 (2007). The General Assembly's decision not to word the Credit Agreement Act more broadly than the general statute of frauds is an indication that it did not intend for the Act to be interpreted differently.

The legislative history of the Act is also instructive. The Senate Judicial Proceedings Committee, in its analysis of House Bill 74 (the genesis of CJP Section 5–408) explained that this legislation "will protect lenders against claims that the lender made a verbal promise to loan money and then refused to do so, or that the lender verbally agreed to extend the terms of a loan." Senate Judicial Proceedings Committee, H.D. 704, 1989 General Assembly of Maryland Floor Report. Notes attached to that bill explain: "All this legislation is saying is that in a commercial setting, if you are going to sue me to enforce an alleged loan agreement, get it in writing and get it signed." *See* Bill File, H.D. 704, 1989 Gen. Assem., 399th Sess. (1989).[10] This legislative history indicates that the

---

**10.** This session of the General Assembly was originally referred to as the 395th Session, and documents from that session bear that designa-

thrust of the Act was to preclude claims seeking to enforce an oral contract to lend or modify the terms of a loan, which is not the type of claim advanced by the Peases. The Act contains no suggestion that a broader bar, which would apply to tort claims, was intended.

The Credit Agreement Act precludes admission of verbal representations made by Martin and/or Wachovia as support for a claim or defense on the contract. I would hold that the Act does not bar proof of the elements of a tort—distinct from a contract claim or defense—such as the duty of care required in negligence, or the specific intent to defraud required in fraudulent misrepresentation.[11] This is no mere distinction

---

tion. The revised numbering "incorporates William J. Shepherd's discovery [of an unrecorded session in 1876] during his research for ... the State Archives[,] ... [as well as] three of the extralegal conventions that sat between 1774 and 1776." *See* 186 *Archives of Maryland* 127 (1994–95), *available at* http://www.msa.md.gov/megafile/msa/speccol/sc 2900/sc2908/000001/000186/html/am186–127.html (last visited Aug. 10, 2010). The revised numbering is "the standard by which legislative sessions are counted to include all sessions convened." *Id.*

**11.** Wachovia also cannot rely on the parol evidence rule to quell the Peases' claims of fraud and negligent misrepresentation. In *Greenfield v. Heckenbach*, 144 Md.App. 108, 797 A.2d 63 (2002), purchasers of real estate asserted claims of fraud and negligent misrepresentation against the couple that had sold them the property. Before the purchase, the sellers had shown the then-prospective buyers building plans of a house the sellers were constructing on an adjoining property. *Id.* at 115, 797 A.2d at 67–68. According to the plans, the newly constructed structure would not obstruct the buyers's view of the water. *Id.* at 115–16, 797 A.2d at 68. Later, the parties entered into a contract of sale that contained an integration clause:

> This Contract and any Addenda thereto contain the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms[,] conditions, statements, warranties or representations, oral or written, not herein contained.

*Id.* at 117, 797 A.2d at 68. After returning from vacation, however, the buyers discovered that the sellers's new house, which deviated from the original plans, did indeed block the buyers's view of the water. *Id.* at 118, 797 A.2d at 69. The buyers sued and the sellers argued that any oral representations made by them regarding their construction plans were barred by the parol evidence rule. *Id.* at 113, 797 A.2d at 66. The CSA concluded that the parol evidence rule could not work to exclude evidence of the representations when that evidence was being

without a difference. The torts of negligence [12] and breach of fiduciary duty [13] require a showing of a duty owed to the debtor. In ordinary loan transactions, the relationship between a debtor and a creditor is a contractual one, and is not fiduciary in nature. *See Parker v. Columbia Bank*, 91 Md. App. 346, 368, 604 A.2d 521, 532 (1992). To sustain an action sounding in tort, the complaining party must prove "a duty or obligation imposed by law independent of that arising out of the contract itself[.]" *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879, 882 (1961). The rigorous proof requirements of these and other torts will insure that neither borrowers nor would-be borrowers can evade the restrictions of the Act by

---

introduced to support tort claims of fraud and negligent representation, reasoning that

[a] party to a contract cannot, by misrepresentation of a material fact, induce the other party to the contract to enter into it to his damage, and then protect himself from the legal effect of such misrepresentation by inserting in the contract a clause to the effect that he is not to be held liable for the misrepresentation which induced the other party to enter into the contract. The effect of misrepresentation and fraud cannot be thus easily avoided. If it could be, the implied covenant of good faith and fair dealing existing in every contract would cease to exist.

*Id.* at 137, 797 A.2d at 80 (quoting *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 338 n. 7, 439 A.2d 534 (1982)).

**12.** The following four elements compose the tort of negligence: (1) a *duty* owed to the plaintiff (or to a class of which he is a part), (2) a breach of that *duty*, (3) a legally cognizable causal relationship between the breach of *duty* and the harm suffered, and (4) damages. *See Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986) (emphasis added). Ordinarily, there is no affirmative duty of disclosure between parties dealing at arm's length, but a party does have "the duty to disclose facts discovered after having made a representation to another if one knows or believes these facts make untrue or misleading the original statement (even though the statement may have been true, or believed true, when made)." 2 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, *Harper, James and Gray on Torts* § 7.14 (3rd ed.2006).

**13.** To prevail on a claim of breach of fiduciary duty, a party must prove: "(1) the existence of a fiduciary relationship, (2) a breach of *duty* owed by the fiduciary to the beneficiary, and (3) harm resulting from the breach." *Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 192, 665 A.2d 1038, 1046 (1995) (emphasis added).

simply adding a ᵗnew label to their claims or defenses.[14]

Accordingly, here, to prove a claim in negligence the Peases would have to prove that Wachovia owed a duty to them more extensive than the mere obligation of good faith dealing implied in every contract. *See Clancy v. King*, 405 Md. 541, 565, 954 A.2d 1092, 1106 (2008) ("Even if [a] contract [does] not contain this general good faith term, Maryland contract law implies such an obligation"). Arguably, an even greater burden of proof lies in the tort of fraud, where the Peases would have to show that the bank actually had the intent to defraud.[15] *See Parker*, 91 Md.App. at 359, 604 A.2d at 527.

---

**14.** Thus, I do not agree with the CSA's view that the economic policy of CJP Section 5–408 "is *only* upheld if tort claims based on an unenforceable alleged agreement are excluded." *ST Systems Corp. v. Maryland Nat'l Bank*, 112 Md.App. 20, 32, 684 A.2d 32, 38 (1996) (emphasis in original). In *ST Systems*, Maryland National Bank offered conditional commercial financing to ST Systems Corporation. *Id.* at 24–25, 684 A.2d at 34. One condition of the loan was that no material adverse change in the financial condition of either ST Systems or its principal could arise prior to the loan closing date. *Id.* at 26, 684 A.2d at 35. After the closing documents were drawn, the principal of ST Systems informed the bank, for the first time, that he had an outstanding personal liability of $4,000,000. *Id.* at 25–26, 684 A.2d at 35. As a result, the bank withdrew the financing proposal. *Id.* at 26, 684 A.2d at 35. ST Systems filed a complaint against Maryland National Bank alleging breach of contract and various tort claims based on the bank's conduct during the loan negotiations, including fraud in the inducement and breach of fiduciary duty. *Id.* The CSA affirmed the trial court's dismissal of ST Systems's tort claims because it interpreted the Maryland Credit Agreement Act as excluding all tort claims based on an unenforceable alleged agreement. *Id.* at 32, 684 A.2d at 38. The court stated that "[s]ubjecting lenders to expensive tort claims would allow parties to avoid [the Act's] protective reach, thereby rendering [it] merely a symbolic shell without any real effect." *Id.* The CSA also concluded that if the legislature had wished to allow tort claims based on oral representations, it would have so expressed its intent in the Act. *Id.* at 33, 684 A.2d at 38. This is clearly at odds with our interpretation, which rests on the established presumption that the legislature knew of the caselaw permitting tort actions based on agreements that were otherwise invalid because of the statute of frauds, and thus would have specified a different result if it so desired. *See* discussion, *supra*.

**15.** In an action for civil fraud based on an affirmative misrepresentation, a plaintiff must prove that:

(1) the defendant made a false representation to the plaintiff, (2) either the falsity of the representation was known to the defendant or

These requirements are not insignificant hurdles for the Peases to overcome. I am confident that adopting this holding will not expose lenders, such as Wachovia, to an excessive amount of tort litigation or judgments based on oral representations made during the commercial lending process.

Accordingly, like the majority, I would remand the case to the trial court so that it may determine whether the Peases can allege a potentially meritorious tort defense that is sufficient to open, modify, or vacate the confessed judgments against them. I confess that I am somewhat skeptical of the Peases's ability to do this on the facts as currently contained within their complaint. Nevertheless, with more discovery, they may be able to better develop the record.

Chief Judge BELL and Judge MURPHY authorize me to state that they join in the views expressed in this concurring and dissenting opinion.

the representation was made with reckless indifference to its truth, (3) *the misrepresentation was made for the purpose of defrauding the plaintiff,* (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.
*Hoffman v. Stamper,* 385 Md. 1, 28, 867 A.2d 276, 292 (2005) (emphasis added).